## BOARD OF TRADE OF CITY OF CHICAGO v. O'DELL COMMISSION CO. et al.

### (Circuit Court, S. D. Ohio, W. D.   March 1, 1902.)

### No. 5,555.

EXCHANGES—RIGHT TO ENJOIN USE OF QUOTATIONS—PERMITTING ILLEGAL TRANSACTIONS.

The evidence on a motion for a preliminary injunction showed that the greater part of the transactions on the exchange of the Chicago Board of Trade, complainant, were in futures, in which, while in form contracts for the sale and delivery of commodities in the future, it was not contemplated by either party that such commodities would be actually delivered or paid for, but that the deal would be closed by the payment of differences in some form of settlement. It was further shown that such facts were fully known to complainant's officers. *Held,* that such transactions were bucket-shop deals, in violation of the laws of Illinois, and illegal under the statute of Ohio, and that complainant, knowingly permitting the use of its exchange by its members for such purpose, had no standing in a court of equity which entitled it to an injunction against the use of the quotations made on its exchange by a concern conducting a bucket-shop business in Ohio.

In Equity. On motion for preliminary injunction.

Henry S. Robbins and Thornton M. Hinkle, for complainant.

Foraker, Outcalt, Granger & Prior and Shay & Cogan, for respondents.

THOMPSON, District Judge. The bill states, in substance, that the complainant is a corporation organized to maintain a commercial exchange; that it is maintaining such an exchange; that the volume of its transactions is so large that it has become one of the great grain and provision markets of the United States; that the quotations of the prices made in these transactions have become a species of property of great value to the complainant; that complainant furnishes these quotations to the telegraph companies, who pay complainant large sums of money for the privilege of selling them to their customers; that they are so furnished to the telegraph companies under contracts by the terms of which the telegraph companies agree that they will not knowingly sell or transmit the same, directly or indirectly, to any person, firm, or corporation conducting a bucket shop or other similar place where such quotations are used as a basis for bets or other illegal contracts based upon the fluctuations of the prices of commodities dealt in on said exchange; that the defendant the O'Dell Commission Company conducts a bucket shop where complainant's quotations are used as the basis for bets on the fluctuations of the prices of commodities dealt in on complainant's exchange; that these quotations are obtained by the O'Dell Commission Company from the telegraph companies surreptitiously and by theft, or from persons who so obtain them; that the unauthorized use of these quotations by the O'Dell Commission Company, without their being obliged to pay complainant or the telegraph companies anything therefor, is

calculated to, and in time will, if not entirely stopped or prevented, destroy the value thereof to complainant; and the prayer of the bill, among other things, is that the O'Dell Commission Company be enjoined from receiving or using these quotations. The O'Dell Commission Company and its officers deny that they conduct a bucket shop, or that they obtain complainant's quotations surreptitiously or by theft, but do not deny that they are receiving and using the same, and admit "that neither of them is paying either of said telegraph companies therefor," and admit "that if one person * * * be allowed to secure such quotations without the restrictions as to the use thereof which complainant imposes * * * such person can, if he will and so desires, furnish them to all the bucket shops * * * desiring them, and thus entirely defeat the efforts of complainant to prevent their use in bucket shops as the basis of their illegal transactions"; and they allege that these quotations have become public property, and that they are entitled to receive and use them, and that any refusal of the telegraph companies to transmit them would be a violation of the interstate commerce laws of the United States; and they further allege that complainant conducts a bucket shop or keeps a place in its exchange hall wherein is conducted and permitted the pretended buying and selling of grain, provisions, and other produce, either on margins or otherwise, without any intention of receiving or paying for the property so bought, or of delivering the property so sold, and that much the larger part of its transactions are of this character; and that complainant cannot have a property right in quotations founded in greater part on gambling transactions, nor any equitable right to enjoin the use of such quotations by a rival in the bucket-shop business. The admissions of the pleadings and the evidence show conclusively that the O'Dell Commission Company is carrying on a bucket-shop business, and that in furtherance thereof it receives and uses complainant's quotations, without any authority therefor from the complainant or the telegraph companies, or from any one representing them or either of them, and without paying anything for the same to the complainant or the telegraph companies, and that such an unauthorized use of said quotations is destructive of the value thereof to complainants.

Now, passing other questions, does the evidence show that the complainant keeps a bucket shop or place wherein is conducted or permitted the pretended buying and selling of grain, provisions, or other produce, either on margins or otherwise, without any intention of receiving or paying for the property so bought, or of delivering the property so sold?

Its members, if acting in good faith, may buy and sell grain and other produce on its exchange for future delivery, and afterwards, before the maturity of the contracts, may cancel the contracts and settle the transactions covered by them by paying and receiving the differences between the contract prices and the market prices of the commodities, as shown by complainant's quotations, on the day of settlement, without violating the laws of Illinois against bucket shopping, and the test of good faith is whether, when they buy and sell, they

intend to receive and pay for the property so bought or to deliver the property so sold. If the apparent buying and selling is a mere cover for speculating on the fluctuations of the market, it is bucket shopping. The evidence convincingly shows that the larger part of the transactions, in grain and other produce, on complainant's exchange, are mere gambling transactions, conducted by some of its members in violation of the laws of the state of Illinois against bucket shops, and it remains to be considered whether the complainant, the corporation itself, conducts or permits these illegal transactions upon the floor of its exchange. Complainant may not conduct these transactions, but if, through its officers and agents, it knows that they are conducted by some of its members, and does not prevent such transactions, it must be deemed to permit them. It permits unless it prevents, and if it permits then it keeps a bucket shop, in violation of the laws of Illinois, and it will not discharge its duty to the public or escape criminal liability by merely enacting rules prohibiting such transactions. It must go a step further, and enforce its rules, and prevent all such transactions within its knowledge.

The president and a number of members and ex-members of the board of trade have testified as to the manner of conducting the business of the exchange.

William S. Warren, president of the complainant, and who is also the president and manager of Hulbert, Warren & Co., a corporation doing a commission business on complainant's exchange, was called as a witness by the defendants, and testified that his company bought and sold on the exchange about 200,000 bushels of grain per day, or from 50,000,000 to 65,000,000 bushels per year, for future delivery, of which not less than 10 per cent. was delivered; but afterwards, being called upon to show from his books the amounts of his sales and purchases and the deliveries thereunder for the year 1901, testified that his purchases alone for that year amounted to 75,440,000 bushels, of which there was delivered to him 3,145,000 bushels, leaving undelivered 72,295,000 bushels; that the contracts covering the undelivered grain were canceled, and the transactions represented by them were settled, before the day of delivery, by the parties paying and receiving the difference between the contract prices and the market prices, as shown by complainant's quotations, on the day of settlement. Now, it is fair to assume that his sales would equal his purchases, but, if they amounted to even 50,000,000 bushels, it would make his total dealings in grain, for 1901, 124,440,000 bushels, and if 200 members of the 1,803 members doing business on complainant's exchange also dealt in grain to the amount of only 35,000,000 bushels each per year it would make their total dealings 7,124,440,000 bushels, or more than twice the number of bushels produced in the United States in that year.

The contracts for undelivered grain were canceled through a process of offsetting or "ringing up," facilitated by the conveniences afforded by the exchange clearing house. Section 6 of rule 22 of the rules and regulations of complainant provides:

"Sec. 6. In case it shall appear that the delivery of any outstanding trade or contract between members of the association may be offset by some other

corresponding trade or contract made by the parties with other members of the association, and the parties to such trade or contract, or their authorized agents, consent to such offset, such trade or contract shall be deemed to have been settled, and any balance between the current market value of the property covered by such trade or contract and the several contract prices shall be due and payable immediately by the party from whom such balance may be due to the party entitled to receive the same under his contract. The current market value of the property contracted for shall be conspicuously posted, at a stated hour each day, under the direction of the board of directors, in the exchange hall, and in the settlement room of the board, which posting shall serve as a basis for the adjustment of all contracts settled, as herein provided, on that day. In order to facilitate the operation of this section, each member is required to keep a settlement book in which shall be entered the names of parties with whom settlements have been made, and the dates and terms of the trades included in such settlements, and the terms of such settlements, and the prices at which the commodities were originally sold or purchased, and the amounts due to or from him or them on each separate settlement, also the net amount due to or from him or them on all settlements; and the board of directors is hereby authorized to provide a suitable office, with the necessary employés, to which members shall be required, at stated hours each day, to make reports, showing the net balance due to or from each member, as shown by such settlement book, and also the general balance due to or from him or them upon all such settlements, each report to be accompanied with an acceptable check for the aggregate of balances, if any, due from him or them on the contracts so settled; whereupon, if said report is found to be correct as compared with other reports rendered him, the person in charge of said office shall, at a stated hour each day, pay to each of the parties making such reports any balances which he may have collected, and which shall appear to be due to them by said reports, less such charges as shall be prescribed by the board of directors as compensation for the service of said office."

For the year 1900 the clearings amounted to $62,229,165.25, and the balances paid over by the clearing house were $23,821,284.05, as shown by the anual report of the board for that year. The report furnishes no statement of the cash transactions made on the exchange. The making, operation, and enforcement of these clearing house rules and regulations require a knowledge of the transactions which ought to disclose their true character.

The process of "ringing up," as it is called, is described by Warren as follows:

"Q. Is the manner of 'ringing up' deals there a regular course of business? A. Yes, sir. Q. Are those deals that are 'rung up' in the regular course of business settled by a mere payment of differences between the two prices of purchase and sale? A. They are settled by the payment of a difference based on the settling price of the day. * * * [Where the '*' is used, it is to indicate omissions.] Q. What does he fix the settling price from? A. The average market price of the day. * * * Q. How is it based upon the settling price? A. Through the clearing house. * * * Q. That is right. Now, how is it done? A. It is done by the payment of a check for the balance or the receiving of a check. Q. The balance of what? A. The balance that is due or payable on the settlements of the day. * * * Q. Now, how are they— Just tell us how they are settled. A. Well, if I have bought of you 5,000 bushels of wheat for May delivery, and sold it to Mr. Robbins, and Mr. Robbins has, in turn, sold it to you, we make an offset of those trades, and each one pays or receives, as the case may be, the difference, based on the settling price of the day. Q. How do you arrive at the difference based on the settling price? A. I don't understand your question, Mr. Jenks. (Question read.) A. I will have to get a pencil and paper and

115 F.—37

figure it out. * * * Mr. Jenks: Q. No; describe it so that these reporters can write it down. A. Warren has sold to Jenks 5,000 bushels of wheat at 79 cents. Jenks has sold it to Robbins at 79½. Robbins has sold it to Warren at 80. An offset is made of those trades, and the differences are settled through the clearing house on the basis of a settling price of, say, 79½. Q. Who says 79½? A. The board of trade. Q. Well, all right. Now, you send the clearing house sheet to the clearing house the next morning, don't you? A. Yes, sir. * * * Q. Well, then, I put in a clearing house sheet, and I state there is owing to me how much? A. $25.00. Q. Robbins puts in one, and he says there is owing to him how much? A. $25.00. Q. You put in one that you owe how much? A. $50.00. Q. Whom to? A. The clearing house. Q. Then all three of us would send in a clearing house sheet? A. Yes, sir. Q. Two of us would say that we claimed from the clearing house so much? A. Yes, sir. Q. What would those amounts of claim and debit arise from? A. From the difference in price in the purchases and sales. Q. Now, I will suppose that you sold to me to-day 5,000 bushels of wheat for May delivery; I to-day sold to Mr. Robbins 5,000 bushels of wheat for May delivery; he to-day sells to you 5,000 bushels of wheat for May delivery. When is that 'rung up' between us three? A. At any time between now and the 30th of May,—31st of May. Q. You can 'ring it up' to-morrow morning? A. Yes, sir. Q. And pay those differences, and receive them through the clearing house? A. Yes, sir. Q. Now, we three are members of the board? A. Yes, sir. Q. Supposing that in that same transaction you had a customer, and say that customer is Mr. Whitney, who ordered you to sell 5,000 bushels of May wheat, which you sold to me. You have another customer, and we will say that that customer is Mr. Shea, who orders you to buy 5,000 bushels of wheat. Now, we will say that that transaction between you, me, and Mr. Robbins and yourself grew out of those two orders, and Mr. Whitney and Mr. Shea were not members of the board. We will say that is to-day. To-morrow Mr. Whitney orders you to buy that wheat which you have sold for him. What will you do? A. I would go on the market and buy it. Q. Then suppose that was the only transaction Mr. Whitney had with you, and he wanted to get out and stay out; how would you close that up with him? A. I would render him an account of purchase and sale, and assume the contracts myself. Q. What contracts? A. The contracts for the purchase and sale that I had made on his order. Q. Where have you got any, in the case I cited? A. If I haven't these, I have others. Q. Have you? Now, we will suppose that Mr. Shea wants to close out his, and he orders you to buy in his wheat; what do you do? A. I go into the market and buy it. Q. And how do you close it out with him? A. In the same manner. Q. The same manner as what? A. As I did with Mr. Whitney. Q. That is, if each one of them make money, as a profit on the difference between the purchase and sale price, you would give each one of them your check? A. For the net profit; yes, sir. Q. After taking out the commission and everything else? A. The war tax. Q. Now, suppose each of them lost money; what would you do? A. I would collect it of them, if I could. Q. Yes; and that that you collected would be the difference between the purchase and sale price, deducting the commission and the war tax? A. Adding the commission, in this case. Q. Well, adding the commission and war tax? A. Yes, sir. Q. Then, if they had put up any margins to begin with, you would give them what was left of that, wouldn't you? A. Yes, sir. Q. Now, you say that in both of these cases you have 'rung up' your deal on the board, mind you, by this set-off in the trade that you had with me, and I had with Robbins, and Robbins had with you; you have 'rung them up.' Now, you have had only these two orders here. You say that you still have got the contracts open,—one of purchase and one of sale? A. I did not say so. If I did, I didn't understand the question. In the supposititious case which you have given, the whole thing— Q. The whole thing is ended? A. Yes, sir. Q. And we will say the initial transaction was to-day, and the closing out of the whole business was to-morrow, and this deal was a purchase for May delivery; then that whole business will have been conducted from beginning to end and settled on the mere difference in the market price,

wouldn't it? A. Yes, sir. Q. And all the members of the boa.d conduct their business in the same way, where the trades are the same as you have described; I mean where the customers give the same sort of orders, and you are able to make the 'ring' in the same way? A. Every member of the board, Mr. Jenks? Q. Yes; all of them who do that kind of business, do they do it in the same way? A. That is the general course of business; yes, sir. * * * Q. Now, that trade between you and me, I have sold to you and have bought from you the same commodity, for the same delivery, but at a different price,—one side of it is 75 cents, and the other side is 74 cents; according to the practice over on the board, you and I may balance those two contracts, may we not? A. Yes, sir. Q. Without delivery cancel the contracts by going through the clearing house with our respective clearing house sheets, and one of us claiming from the other that one cent a bushel, and the other paying the one cent a bushel through the clearing house. That would end the transaction between us, would it? A. Yes, sir. Q. And we settle those contracts upon the difference in the two prices,— one 75 cents and the other 74. That is right, isn't it? A. You settle it on the difference in value of the two parcels of wheat. Q. And the value is fixed by the two prices? A. Yes, sir."

Deliveries by notice are described by Warren as follows:

"Q. Then this 7,000,000 and odd that you delivered by notice. Did those delivery notices start from your office? A. No, sir. Q. Did any of them stop with your office? A. Of the 7,000,000; no. Q. Do you know through how many different hands those notices passed before they came to you, and before they stopped, after they were in your hands? A. I do not. Q. The 7,000,000 that you say were delivered by notices, those transactions were settled up by you by merely paying or receiving the difference in the purchase and sale price of the commodities, weren't they? A. Differences are adjusted between the values of the property at the purchase and sale prices. Q. Well, I don't see any difference; maybe you do. The difference in the two prices—the contract prices, the purchase and the contract price of sale— was all that was paid or received by you in winding up those transactions, where the notices of delivery were given, weren't they? A. Yes, sir. Q. And those matters were put on the clearing house sheet, and passed through the clearing house, just the same as though the deals had been 'rung up,' were they not? A. Yes, sir."

As to whether all members do business in this way, Mr. Warren says:

"Q. Mr. Warren, do you know how other members of the board of trade conduct their business at the pits and on the floor of the exchange? * * * A. I have no personal knowledge of the manner of any person's business except my own. Q. As president of the board of trade, you don't know how any other member of the board transacts or conducts his business which is transacted or conducted on the floor of the exchange room of the board of trade,—is that correct? A. I know he has to do it according to the rules of the board of trade. * * * Mr. Jenks: Answer. A. I cannot answer that question in all its detail. I may know in a general way. No two firms, perhaps, conduct their business exactly, in all its minutiæ and minute details, in the matter of their accounts and everything of that sort, alike. Q. You haven't been asked that, have you? Mr. Warren, you are a man of a little extra intelligence. Now, if you do not understand the question that I put to you, just say so. Do you know how other members of the board of trade transact their business on the floor of the exchange room, and at the pits, in the business that they do transact there, and will you answer the question yes or no? A. Will you make it a little clearer what class of business you refer to? Q. That which they do at the pits, or on the floor of the exchange room, and at the same place where you transact your business? A. Well, I know, in general terms, how they do it; yes. Q. How? A. I know, in a general way, how they do it; yes. Q. Do they

do it in the same way you have described as the manner in which you do your own business? * * *  A. The only description I remember of having testified to were those hypothetical trades between you and myself. Is that what you have reference to, Mr. Jenks?  Mr. Jenks:  Q. I want to know whether the other members of the board do their business in the same way that you do your business at the pits?  A. In a similar manner; yes. * * *"

As to bucket shopping, Mr. Warren says:

"Q. Then you don't know what a 'bucket shop' is, as that term is used by the board of trade of the city of Chicago in its rules? * * *  A. Yes; I know.  Mr. Jenks:  Q. What is it?  A. It is a place where dealings are had upon the fluctuations in the market price without any bona fide transaction. * * *  Mr. Jenks:  Q. In your meaning, would it be a bona fide transaction if the parties did not intend to receive or deliver, but did, as a matter of fact, settle on differences in the market price? * * *  A. If the parties did not intend to receive or deliver, that says, does it?  Mr. Jenks:  Q. Yes.  A. No; it would not.  Q. But if they did intend to receive or deliver, and did then settle on the difference in the market price, that would be a bona fide transaction?  A. Not in a bucket shop.  Q. Not in a bucket shop?  A. No, sir.  Q. If parties dealt together, one contracted with the other to buy 10,000 bushels of May wheat, and afterwards sold out that 10,000 bushels of May wheat to the same person, and they settled both contracts by payment of the difference in the market price, would that be a bona fide transaction, according to the rules of the board of trade? * * *  A. Yes. * * *  Q. But if the same kind of contract is made anywhere else in the purchase and sale of commodities, and they 'ring up' the deals, and settle them by merely paying the differences, is that a bucket-shop transaction, according to your notion? * * *  A. The same kind of transaction as what, for instance? * * *  Q. I mean, made anywhere away from the board of trade?  A. You could not make the same kind of contract away from the board of trade, because it would not be subject to the rules of the board of trade.  Q. Do you define as bucket-shop deals such as are not made under the rules of the board of trade? * * *  A. Not necessarily.  Mr. Jenks:  Q. Well, if, as a matter of fact, a man kept a place, and he bought and sold for future delivery, and 'rung up' those trades by merely settling the difference between the purchase and the sale price, according to your notion would that be a bucket-shop deal? * * *  A. Yes, sir. * * *  Mr. Jenks: · Q. As a matter of fact, do you contend that the business of the members of the board and the board is increased when bucket shops are closed? * * *  A. Yes, sir.  Mr. Jenks:  Q. If the bucket shops are closed, is the business of the board of trade increased, because the persons who deal at the bucket shops would deal on the board of trade, through its members?  A. Yes, sir. * * *"

As to the visible supply of grain in Chicago on December 2, 1901, Mr. Warren testified:

"Q. Do you know what the visible supply of wheat in the city of Chicago was on the 2d day of this month (December, 1901)?  A. Approximately.  Q. How much?  A. About 10,000,000 bushels.  Q. Do you know the supply of corn in elevators in the city of Chicago on the 2d day of this month?  A. Approximately.  Q. How much?  A. About 9,000,000 bushels.  Q. Do you know the supply of oats in Chicago on the same day?  A. Approximately.  Q. How much?  A. About 2,000,000 bushels. * * *  Q. You don't know how many bushels of No. 2 and No. 1 wheat there were in store?  A. I know approximately how much No. 2 there was.  Q. How much No. 2?  A. About 4,500,- 000.  Q. No. 2 wheat in the—  A. I beg your pardon.  Contract wheat is what I meant to testify to.  That includes No. 2 red winter and No. 1 northern spring.  Q. There was about 4,000,000 bushels of that?  A. I think 4,500,000 bushels,—4,500,000 to 5,000,000.  Q. 4,500,000 to 5,000,000 bushels of wheat that would be deliverable under contracts made on the board of trade here?  A. Yes, sir. * * *  Q. But can you give us an estimate of the quantity

(wheat) that you dealt in for the December option? A. Yes; I will give you an estimate. Q. How much? A. Probably 5,000,000 bushels. Q. Can you give us an estimate of the amount of corn that you dealt in for the December option; I mean your firm or corporation? A. Probably 2,000,000 or 3,000,000 bushels. Q. Did you deal in oats? A. Yes, sir. Q. About what quantity for the December option? A. Well, probably 1,000,000 or 1,500,000 bushels. Q. For the December option how much wheat have you delivered up,—actually delivered and received pay for? A. I don't know. Q. Can you make an estimate of it? A. No, sir; I wouldn't make an estimate of it. Q. Or the corn? A. No, sir. Q. Or the oats? A. No. Q. Or that you have delivered? A. It is all included in the estimate for the entire year which I gave you. Q. Yes; all that you have delivered has been done within a week, hasn't it,—this week? A. Yes, sir. Q. And you don't know how much it is? A. No, sir. Q. Have you delivered any? A. I think we have. Q. But you are not sure of that? A. I know we have received. I wouldn't testify that we have delivered. Q. What is your best recollection as to whether you have delivered out anything? A. I think we have delivered out some wheat. Q. Do you know how much? A. No; I do not. Q. But you are not sure that you have delivered out wheat? A. No; I wouldn't swear to it."

In relation to "hedging," Mr. Warren testified as follows:

"Q. Do you ever make contracts for future delivery against that grain in the Chicago market? A. Yes, sir. Q. That is what is called 'hedging,' is it? A. Yes, sir. * * * Mr. Robbins: Q. I wish you would describe this question of 'hedging.' What class of 'hedging' you do, first? A. Well, I buy grain in the country and put it in store, and sell against it for future delivery. Q. Where? A. On the board of trade. Q. Now, what happens when you get ready to move,—to sell that grain, part with it? A. Well, I move the grain in here, and deliver it on the contracts. I may sell it to some one else here, I may sell it to go in other directions, and when it is so delivered the contract is filled, or when so sold the contract covered by a purchase in the market. Q. What quantities in your business do you deliver on those 'hedging' contracts on the Chicago Board of Trade? A. Well, that is a very general question. At times, we deliver considerable; other times, we deliver very little. Q. You sell where it is to the best advantage to sell at the time you determine to part with the grain? A. When May corn was at a great premium last spring, we delivered quite a large quantity of corn on contracts in the country. * * * Q. An exporter of the commodity, who intends to export it, and who makes a 'hedge' sale of it on the board of trade, does that 'hedge' sale stop him from exporting? A. No. * * * Q. How does he get out of that 'hedging' contract of sale? A. He buys it in. Q. Then how does he settle the two contracts,—the one of sale and the other of purchase? A. He may settle them by delivery; he may settle them by offset. Q. He has shipped off the stuff that he contracted to sell? A. The man he buys of may deliver to him, and he will deliver it to the man he sold it to. Q. That is it? A. Yes, sir. Q. Is that the usual way that they close their 'hedging' contracts? A. It frequently happens that way. Q. Is that the usual way? A. It is not the usual way. Q. What per cent. of them are closed up in some other way? A. I wouldn't be able to testify on that. Q. What is the other way that you close them up in? A. Settling. Q. 'Ringing' them up and paying the difference? A. Yes, sir. Q. Isn't that what the exporter calculates to do, if he makes a 'hedging' trade? A. I don't think he always knows what he will do when he makes the trade. Q. Are you an exporter? A. To a small extent. Q. When you export the stuff after you have made a sale of it on the board,—a 'hedging' sale,—you calculate to deliver the stuff that you export on that sale, do you? A. You mean the identical stuff? Q. Yes, sir. A. Certainly not. Q. Do you expect to buy that stuff in and 'ring it up'? A. I expect to buy it in; I don't expect to 'ring it up.' Q. You don't expect to? A. No, sir. Q. But you know, as a matter of fact, that in ninety-nine cases out of one hundred you do 'ring it

up,' don't you? A. I don't know that. Q. You don't know that? A. No, sir. Q. You do know that in ninety-five cases out of a hundred you do 'ring it up'? A. I would say in the majority of cases we do. Q. Can you answer the question just as well? A. I wouldn't swear to any specific per cent. Q. Would you swear that in ninety per cent. of the cases you 'ring it up'? A. No; I would not. Q. Would you swear in eighty-five per cent. you 'ring it up'? A. Well, I should think that would be a pretty fair average; I will take the chances on swearing to that. * * * Q. Now, just confine yourself to wheat. The miller has got wheat which he intends to manufacture into flour, and he 'hedges' on the board of trade by selling a like quantity of wheat. He manufactures the wheat that he has into flour, ships the flour away, and sells it. Can he deliver that wheat on his 'hedging' sale made on the board of trade? A. No. Q. How can he get out of that, then? A. Buy it in. Q. Then if he does buy it in, and he don't want the wheat, how does he 'ring up' the deal? A. He may settle the deal by delivery; he may settle it by offset. Q. And 'ring,' and closing through the clearing house? A. Yes, sir."

As to cash sales, Mr. Warren testified as follows:

"Q. Are your deals in cash transactions usually made on the board of trade? A. Some of them. Q. Well, it is a small proportion of them, isn't it; the cash transactions? A. Yes, sir; it is less than our future dealings. Q. No; a small proportion of the cash transactions that are made? A. Oh, we buy more cash grain in the country than we do in Chicago; yes, sir. Q. That is what I am after. You don't buy very much cash grain on the floor, do you? A. Oh, we buy considerable at times. * * * Q. Where is it done? A. It is done sometimes in the same place that the future dealing is done; at other times, it is done down among the tables, in what we call the 'cash crowd.' Q. Well, you have a place for the 'cash crowd.' It is very seldom done at the pits, isn't it? A. Rather seldom; yes. Q. Now, the market for dealing in futures on the floor of the exchange room opens at what hour? A. 9:30. Q. And the place for that is at the pit? A. Yes, sir. Q. The market for dealing in cash stuffs opens at what hour? A. The carlot market opens at about 11 o'clock,—half past eleven. Q. That is over by the tables? A. Yes, sir. Round lots of cash grain are dealt in at any time of the day or evening, however. * * * Q. What I mean is this, Mr. Warren: that you are not at all confined to the floor of the exchange room in buying cash orders? A. No, sir. Q. You buy those wherever you find them,—wherever you meet the man? A. Yes, sir. * * * Q. Is cash stuff —exclusively cash stuff—sought for in the pits, and trades made in it at the pits? A. Sometimes. Q. Very seldom? A. Rather seldom. Q. The pits are not for that purpose, are they? A. They are. Q. They are used generally for the transactions in futures? A. The greater part."

W. E. McHenry, a member of the board of trade, and a broker and commission merchant, who has been doing business on its exchange since 1867, testified that on one call he bought 5,300,000 bushels of wheat for future delivery; and he also testified, to repeat his language:

"Q. Yes; for future delivery? A. I should say that, take my own business as a sample,—of course, varying a great deal under different circumstances,—that about five per cent. of the amount of property that I have dealt in upon the board of trade has been settled by the actual receipt and delivery of property. That would be about a fair estimate."

And of the 5 per cent. only part was actually delivered and paid for, the remainder being delivered by notice, and that 95 per cent. of his transactions were closed by settlements on "rings," through the clearing house; and he also testified as follows:

"Q. Have you any deals open for December wheat on the 1st day of December [1901]? A. Well, the 1st day was Sunday; better make it the

2d.   Q. On the 2d day of December?   A. Yes; I had 10,000 bushels coming and 10,000 bushels going.   Q. Out of the 500,000?   A. Yes, sir.   Q. What was done with that 10,000?   A. That was delivered to me, and I delivered it out. Q. But you did not pay for it?   A. No, sir.   Q. It was delivered to you by a notice, in the way you have described, and the notice was passed right over by you to somebody else?   A. Yes, sir."

In relation to the duty of the settlement clerks, Mr. McHenry testified:

"The Master: Q. Divide that into two parts: First, what are their duties? Answer that first.   A. Well, I will take my own settlement clerk as a sample. Mr. Jenks: Yes.   A. Every day, at the close of the session, I give him my card for the transactions I have made during the day on the bought or sold side of that card.   He takes that, and goes around among the other settling clerks employed by other members of the board, and endeavors to settle my contracts,—get them off my book.   Q. How can he do that?   A. There is a collection of these people that are employed by the members of the board, and they get together, and find out where people have property bought for a delivery or property sold for a delivery, and endeavor to make these settlements between each other.   Q. And all of those settling clerks that meet there are employed by their employers for the same purpose, are they not?   A. Yes, sir.   Q. Now, they go over and ascertain who has got this commodity bought and sold.   What is the object of your clerk in being there? Suppose you have made a sale on your card of a commodity; what do you want that clerk to find out?   And what does he go there to find out?   A. He goes there to find out to whom the party—   Wait a moment; just a second.   I will get this straight in my head in just a moment.   He goes through to find out to whom people have property sold, and I have it sold to; to see—to ascertain—if I have it bought of somebody else that those people have it sold to, and thus make a 'ring,' if he possibly can, or a settlement.   *   *   *"

As to where it leaves the customer of the commission man, Mr. McHenry says:

"Q. Now, we will suppose that all those members of the board are commission men, and they are all dealing for outside customers which they have;   do they pay any attention to those outside customers, or their contracts, in 'ringing up' those deals on the board, as between themselves?   A. Not unless they have special directions from the customers not to 'ring up' or settle their contracts;   otherwise than that, the customer is not paid any attention to whatever in the settlement of these trades.   Q. Is it the rule and general custom to 'ring up' these deals wherever they can, and cancel the contracts without reference to their customers at all?   A. Yes, sir. *   *   *   Mr. Jenks: Q. Suppose a commission man has a customer who orders a purchase of 10,000 bushels of wheat to-day for May delivery, and he to-morrow orders that purchase closed out;   what does the commission man do?   A. He goes upon the board of trade and buys it first.   Then he sells it, reporting the sale to the customer, making him out an account of purchase and sale, charging him the commission, government tax, and charging him up or crediting him with profit or loss, as the case may be, in the transaction.   Q. Then, if a customer to-day buys 10,000 bushels of May wheat at a price, how can he get out of that transaction, if he wants to, to-morrow?   A. By simply ordering his commission merchant to sell it.   Q. And the commission merchant always does sell it under such circumstances? A. Under such circumstances; yes, sir."

As to stop orders, he says:

"Q. Mr. McHenry, I don't know whether I asked you this yesterday.   If I did, you will remember better than I.   In receiving orders from your customers to buy or sell commodities on the board of trade, are there sometimes, accompanying those orders, a stop order to limit the loss?   Did I ask you

that yesterday? * * * A. It occasionally happens, but very rarely. Q. When it does happen that a stop order accompanies the order of purchase or sale, is that order executed just the same on the board of trade as it would be if the stop order was not there? A. Yes, sir. Q. Then, when the price fluctuates so as to come to the stop order price, does it require any further directions from the customer before the board of trade man will close that transaction out on-the floor? A. An order filled under instructions of that kind is, and should be, closed as near the stop order price as possible. Q. And without any further directions from the customer? A. Yes, sir. * * * Q. Now, between you and the customer, what is done to end the whole business? A. Well, to answer that question, I shall have to say something else. The Master: Proceed. A. For the simple reason that I might buy 5,000 bushels of wheat for John Brown to-day at 79 cents, for May delivery. He would tell me to stop that at 76 cents. Wheat did not reach 76 cents to-day, but to-morrow morning it opens at 75½ cents. It would then be my duty to close that contract of his at the nearest to 76 cents that I could. He would then owe me a half cent a bushel more than his stop or order price. * * * Mr. Jenks: Q. Now, suppose you did close it out as near the stop-order price as you could; what else would be done in order to terminate the whole transaction between you and your customer? A. I would make up an account, purchase and sale, for 5,000 bushels of wheat bought for May delivery, at 79 cents, sold at 75½; that is, assuming, of course, that I could not stop it at 76. I would charge him with the loss, including the commission and government tax. Q. And the loss would be the difference in the two prices bought and sold? A. Yes, sir."

As to bucket shops, he says:

"Q. Isn't it a fact that if on the board of trade they had not an opportunity of 'ringing up' their deals, without the receipt and delivery of the property and paying for it, that it would curtail the business of dealings there in futures or options? * * * A. I think I have already answered just now that it possibly might curtail the volume of business. * * * Mr. Jenks: Q. Is there money enough in the country to carry on the volume of business that is conducted on the board of trade in Chicago, if all those dealings in futures should result in a delivery and payment for the commodity? * * * A. Well, sir; I can't answer that question intelligently. I have seen so much business done in this country, and in so many ways— Mr. Jenks: Q. Without any money at all? A. Well, I don't know as to that; but I am not prepared to say absolutely that the business could not be done, and still I am very frank to say, as I have stated before in my answers, that I have no doubt that if the business were conducted without these settlements, and without the commodities, and under the present rules, that it would be curtailed. Q. What would curtail it? A. First, a lack of absolute stocks on the board in Chicago, the actual property being here. Q. The actual grain, you mean? A. The actual grain being here. * * * Mr. Jenks: Go on. A. Because, under the present system, there is a large amount of property sold in Chicago that is in store all through the country."

As to "ring" settlements he says:

"Q. Is there an object, in your business, to get those settlements made as soon as possible, that the deals may be 'rung up'? A. Yes, sir. Q. You have settlement clerks, whose business it is to see that all deals on the board are closed by 'ringing up,' as soon as a 'ring' can be made, haven't you? A. Yes, sir. * * *"

As to "scalping" he says:

"Q. What is 'scalping' business, Mr. McHenry? A. That is where a man, we will say, buys or sells 5,000 bushels of wheat, and tries to get a quick profit out of it, either one side or the other. Q. How does he try to get a profit out of it? A. He sells 5,000 bushels of wheat at 77, and he can buy it back

at 76⅞, he has made $6.25. * * * Q. Is that kind of business done on the floor of the exchange room of the board of trade? A. Oh, there are what are known as 'scalpers' there. Q. Do they— A. I use that term in contradistinction of a broker or commission merchant."

He also states that after filling a government position he resumed business on June 1, 1901, on the exchange, and bought for December delivery 500,000 bushels of wheat, and sold 500,000 bushels of wheat for that delivery, showing his dealings in wheat for that delivery to be 1,000,000 bushels, or about one-fifth of the visible supply of wheat in Chicago on the 2d day of that month deliverable on contracts under the rules of the board of trade.

James E. Boyd, who, in 1891 and 1892 was the governor of Nebraska, and who was formerly a member of the board of trade, testified that he did a large business in grain on the exchange; that a small day's business would be half a million bushels, and that he had dealt in as high as four or five millions of bushels a day, and he did not believe that in his business the actual deliveries reached half of 1 per cent.; that 99 and over of his customers wanted to speculate in market prices; and in relation to "hedging" he says:

"Q. Will you state what was the course of making 'hedging' deals by other people, so far as you know? A. Well, in the corn states—I will speak of corn particularly—there is a great deal of corn cribbed, and the parties who crib the corn usually sell it for May delivery, and thereby gain the benefit of the carrying charges and such things, between the cash price—the difference in the cash price—and the difference on the May option. I have known men to 'hedge' hundreds of thousands of bushels of corn in that way on the Chicago Board of Trade; but the demand for corn might be more urgent in the South, in Baltimore and St. Louis, and they would ship that corn to St. Louis or Baltimore or Galveston, from our part of the country, and when they were ready to do that then they would close their 'hedging' deal on the Chicago Board of Trade."

As to "scalping" he says:

"Q. What is meant by the word 'scalp' on the Board of Trade of Chicago? A. Well, sir; I take it that a man wants to make a little money, and close his trade out after he makes a little money, and not to receive or deliver the stuff at all,—no idea of that. * * * Q. In these 'scalping' deals, governor,—did you observe when those deals would be closed out, with reference to the time of the original transactions? A. Some might be closed out in ten minutes, some in an hour, and some not for quite awhile,—for many days. Q. As a rule, were they generally closed out by 'scalpers' on the same day that the initial transaction was made? A. Yes, sir; I think so."

William A. Crosby, a member of the board for 30 years, and who did a commission business on its exchange from 1877 to 1887, says there were about 250 members doing a commission business on the exchange. He is now employed by F. G. Logan & Co., and for three years had charge of their business on the floor of the exchange, but now manages their office. He says 99 per cent. of the deals of commission men are for future delivery, and that more than 95 per cent. are closed by "rings" through the clearing house; and as to "scalping" he says:

"Q. Are the 'scalpers' members of the board of trade? A. Well, it is a term that is likely applied— 'Scalping' is applied primarily to members of the board who stand in the wheat pits, for instance, and trade for their own ac-

counts on small profits and small losses, on the fluctuations of the market. Q. That is to say, let's take the case of 'scalping,' and the 'scalper' is operating in May wheat; how does he conduct his 'scalping' operations? A. Well, the term 'scalping' is applied primarily to those traders who stand in the pit and trade for an eighth or a sixteenth profit, or less, making a rapid turn in the market. Q. Close out a trade as soon as they can get a small profit? A. Yes; or a small loss,—as quick in one way as the other."

And he further says that F. G. Logan & Co. have a blackboard in their office to display quotations for the convenience of customers,—to tell them what the market is. About 25 members of the board have blackboards and tickers. F. G. Logan & Co.'s office is in the board of trade building.

As to "hedging" he says:

"Q. You speak of 'hedging.' Do you refer to the 'hedging' that comprises the class of transactions where persons who hold cash property—hold and are carrying cash property—execute contracts upon the board of trade for future delivery of the same quality of the property they have for a future month? A. Well, in a general way, yes. My idea of the correct condition of which the term—to which the term—'hedging' applies would be to people in other markets and in the country who have elevators in the country, and they have cash grain in their elevators, and they want to minimize their risk in holding that grain, and they sell in some other market for future delivery, against the property that they are carrying in their warehouse. I would not consider the term 'hedging' to apply to warehousemen here in Chicago so much. Q. Do warehousemen in Chicago resort to a similar practice, when having property or grain on hand to sell for a future month? A. Yes, sir. * * * Q. How much wheat have you ever delivered on those 'hedging' deals compared with the whole amount of deals that you have managed? A. Very little. * * * Q. Well, do you think it would amount to three per cent.? A. No; I don't believe it would. * * * Q. Well, what I mean is, does the fact that he has a 'hedging' contract on the board of trade here prevent his shipping his property to some other market, or selling it to be shipped somewhere else? A. Why, it does not."

Austin W. Wright, a member of the board of trade and a speculator on its exchange, says:

"Q. What is a speculator on the board of trade? A. One who buys or sells stuff and waits for developments. * * * Q. Can you give us the per cent. of the transactions that resulted in delivery to you and payment for the commodity? A. No, I cannot; I never paid for any stuff but three times, I think,—three or four times. Q. Three or four times? A. Yes, sir. Q. In thirty years? A. Yes, sir. * * * Q. At the time of transactions in those commodities on the floor of the exchange room of the board of trade, what was your intention as to receiving and paying for that stuff? * * * A. I had no intention of either receiving or paying for it, unless it was to my advantage to do so. * * * Q. As a rule, is the market higher or lower on the board of trade than it is anywhere else? A. The speculative market is usually a little higher than it is at points of consumption."

Walter Comstock, a member of the board of trade and a commission man there, says that only about 2 per cent. of the trades made on the exchange for future delivery result in deliveries.

Lyman L. Kellogg is on the board, and states:

"Q. What do you do now, and how long since you were in the receiving business and shipping business? A. Since I dropped that, I am 'scalping.' Q. How long since you have dropped that? A. About ten years ago. Q. How long have you been a 'scalper'? A. About ten years. Q. What is a

'scalper,' as known on the Chicago Board of Trade? A. Well, he buys and sells grain for a small profit. Q. For future delivery? A. Yes, sir."

The president of the board has told how he conducts his business on the exchange, as a commission man, and that the other members who are brokers and commission men there conduct their business "in a similar manner," "in the same way," and that it is "the general course of business," and he necessarily knows, therefore, that transactions in futures are the principal business of the exchange, and that cash transactions are comparatively small, and that of the transactions in futures 85 per cent., according to his statement, or 98 per cent., according to the weight of the testimony, are settled before the day of delivery by the parties paying and receiving the difference between the contract prices and the market prices, as shown by the board quotations, on the day of settlement; and, further, that the assumed quantities of the commodities which are represented to be the subjects of these transactions exceed the entire production of such commodities in the United States; and he knows that it is contrary to human experience that all or more than a small per cent. of such dealings could have been entered into with a bona fide intention to receive and pay for the commodities bought or to deliver the commodities sold; and the testimony justifies the belief that a large part of the deliveries actually made were not contemplated by the parties when the deals were made, but grew out of subsequent conditions, which rendered actual deliveries desirable or acceptable to one or all of the parties. The evidence offered in support of the bona fides of these contracts, fairly considered, goes no further than to show that the dealers believe that they may be required to deliver should the other party violate or repudiate the common understanding that the deals may be "rung up" and settled by paying the difference in prices. And he knows that "stop orders" and "scalping" transactions are, in their nature, inconsistent with and exclude the intention of delivery; the one requiring the closing of the deal by the payment of the difference in prices when the market price reaches a given figure, and the other requiring the same thing in a short time, or as soon as the fluctuations of the market show a small gain or loss. And he knows that as a rule the "hedging" deal is made by one who at the time has the commodity on hand, and who makes the deal to cover possible losses, and the expense of carrying and delivering the commodity, when it is actually sold, whether at home or abroad, and who settles the pretended sale or deal on the exchange by a pretended purchase or deal there, and the payment or receipt of the difference between the prices. The "hedging" deal usually is an appeal to chance for indemnity against the expenses and possible losses of an actual transaction. He knows, too, that actual deliveries are made by the transfer of warehouse receipts and the payment of the price of the thing sold, and not by a mere notice of an intention to deliver, which is passed from hand to hand, through a "ring," in which all deals except the last one are settled by the payment of the differences in prices. And his knowledge of these things must be imputed to the complainant, whose chief officer and

agent he is, charged with the duty of enforcing its rules and regulations, and of conducting its business and managing its affairs, in accordance with the law of the land.

The court finds, therefore, upon the evidence submitted, that the greater part of the dealings in futures on complainant's exchange are bucket-shop transactions, and that they are permitted by complainant in violation of the laws of Illinois. It is suggested, however, that the public good will be best served by suppressing the smaller bucket shops, even upon the application of the complainant; and reference is made to 2 Pom. Eq. Jur. § 941, where it is said that, "in compliance with the demand of a high public policy, equity may aid a party equally guilty with his opponent." But the situation here does not call for the application of that doctrine. The bucket shops are the offspring of the Chicago Board of Trade and kindred organizations, to which they still look for sustenance and life, and they can only be effectually suppressed by striking at the root of the evil. When this species of gambling on the commercial and stock exchanges of the country ceases, the bucket shops will disappear, and not before.

Many applications have been made by the bucket shops to enjoin complainant from depriving them of its quotations, and such applications have uniformly been refused, upon the ground that courts of equity will not lend their aid to carry on an illegal business, nor will they lend their aid to the complainant to maintain a place where bucket shopping is permitted in violation of the laws of Illinois and Ohio.

The application, therefore, of the complainant for a preliminary injunction will be denied.