BOARD OF TRADE OF CITY OF CHICAGO v. L. A. KINSEY CO. et al.*

(Circuit Court of Appeals, Seventh Circuit. April 12, 1904.)

No. 1,032.

1. SALES FOR FUTURE DELIVERY—EVIDENCE OF INVALIDITY—SETTLEMENT BEFORE TIME FOR PERFORMANCE.

The fact that contracts for the sale and purchase of commodities for future delivery, made on the exchange of the Chicago Board of Trade, lawful in form, are settled daily by the payment of differences, or by canceling out and substituting other contracts by what are known as the "direct" or the "ring" methods of settlement, does not render such contracts illegal as gambling transactions, for, being lawful in form, they are lawful in fact, unless it was the intention and understanding of both parties that there should be no delivery; and lawful contracts may lawfully be canceled and settled in advance of the time for performance.

2. EXCHANGES—RIGHT OF PROPERTY IN QUOTATIONS.

Even if it were true that a very large percentage of the contracts for the sale of commodities for future delivery, made on an exchange, were

---

* Rehearing denied May 27, 1904.

¶ 2. Quotations of prices and transactions on exchanges, see note to Sullivan v. Postal Tel. Cable Co., 61 C. C. A. 2.

gambling transactions, such fact does not deprive the board of trade conducting the exchange of its property right in the price quotations based on its sales, which are the same for the lawful as for the unlawful transactions.

3. SAME.

The right of property in market quotations based on the transactions of an exchange, and the right to be protected in such property, are not affected by the fact that such quotations may be used for unlawful as well as for lawful purposes.

4. SAME—RIGHT TO EQUITABLE PROTECTION.

That a board of trade permits gambling on its exchange, in violation of law, does not affect its right to go into a court of equity for the protection of its property right in the market quotations based on the transactions of its exchange, which, as news, are entirely independent of the exchange transactions, since the court cannot deny relief on the ground of the general immorality, or illegal acts, of a complainant, not affecting the particular right asserted in the suit.

Appeal from the Circuit Court of the United States for the District of Indiana.

For opinion below, see 125 Fed. 72.

On final hearing, appellant's bill to enjoin appellees from purloining its continuous quotations was dismissed for want of equity.

Appellees discuss the questions whether the quotations are property, and whether, if so, appellant lost its proprietary right by its method of giving them out; but that part of the case is ruled in this court by the decisions in Illinois Commission Co. v. Cleveland Telegr. Co., 119 Fed. 301, 56 C. C. A. 205, and Sullivan v. Postal Telegr. Cable Co., 123 Fed. 411.

There is, however, one further matter that requires presentation and decision. It pertains to the defense that appellant has no standing in a court of equity for either or both of two reasons: That the quotations are contraband, and may be seized by any one with impunity; that appellant, even if the quotations themselves are not contraband, comes into court with unclean hands, in this: that it seeks to exclude all others from using property (the quotations) which might be put to good uses, in order that it may aid its members in maintaining the gambling in grains and provisions which it permits to be carried on in its exchange hall.

Respecting the facts of this defense, the master found as follows:

"The transactions conducted in the 'pits' of the complainant association, while they are of the same general character, are divisible into two classes, which are described by the members of the Board of Trade as 'hedging' transactions and 'speculating' transactions, respectively. Of the members of the complainant association who are engaged in business in the exchange hall, the number conducting speculative transactions is between one-third and one-half of the total, and practically all of such members conduct a hedging business.

"The principals who are engaged in hedging transactions are, generally speaking, either grain merchants, millers, or manufacturers of grain products. The method of such principals is this: When they have bought grain in the country, or in city warehouses, which they propose to hold for future sales to domestic or foreign purchasers, they at once sell in the pits of the complainant association an equal amount of grain; or, on the other hand, if they have sold to domestic or foreign purchasers grain or grain products for future delivery, they at once buy in the pits of the complainant association an equal amount of grain for future delivery at times corresponding with the times of their selling contracts. And thus, when they have contracts of purchase, they have contracts of sale, for future delivery in the pits, practically even with their purchases; and, if they have contracts of sale with domestic or foreign purchasers, they have contracts of purchase, for future delivery in the pits, practically even with such contracts of sale. The object of such hedging is to insure against loss by fluctuation in the market in the commodity which the principal is carrying, or which he has sold in advance of purchase

and manufacture upon a time contract. A hedge must always be against a cash commodity.

"A speculative transaction is not based upon a cash commodity primarily. In effect, it is based upon the confidence which on the one hand the seller of a commodity for future delivery has in his personal opinion that the price of the commodity sold will by the time of delivery have so declined that he can purchase the commodity for less than his selling price, and thus make a profit, and which on the other hand the buyer has in his personal opinion that the price of the commodity bought will so advance by the time of delivery that the commodity bought will be worth more at the time of delivery than it was at the time of purchase, and that he will thus have a profit. It is possible, under the rules, usages, and practice of the complainant association, for the seller and the buyer, respectively, if either changes his opinion, to buy or sell in the 'pits' the commodity which he has previously sold or bought, as the case may be, for the same time of delivery. While this procedure is in form the same as hedging, it is not designated as 'hedging,' but is styled 'spreading.' It is also possible, under the rules, usages, and practices of the complainant association, for a member of the complainant association to make such counter contract of purchase or sale during the same day that he has under an original contract of sale or purchase, and thus, within the day or within a few days, to have his advantage of profit or to adjust his disadvantage of loss. Such a course of business is designated 'scalping.'

"The evidence does not contain sufficient data upon which to predicate an estimate of the aggregate volume of business conducted in said pits daily, monthly, or yearly. It does appear, however, that the volume of such business is enormous; one firm conducted transactions in wheat daily aggregating 1,500,000 to 2,000,000 bushels, and in corn 1,000,000 bushels daily; another firm's transactions in wheat daily amounted to 6,000,000 bushels; a third firm's transactions in wheat daily amounted to 4,000,000 bushels; a fourth firm's transactions amounted to 1,000,000 bushels daily; a fifth firm's transactions in all grain amounted to 1,800,000 bushels daily; and a sixth firm's transactions in all grain amounted to 2,000,000 bushels daily. While it is true that the business of these six firms in the pits is much larger than the business of any other six firms conducting transactions in the pits, and that it would not be proper to say that the average business is a proper average of each of the persons conducting transactions in the pits, it is nevertheless true that it is fairly deducible from the evidence that the aggregate business transactions in grain was largely in excess of the total wheat and corn production of the entire United States during either of the years 1900 and 1901, and was many times over the entire receipts in Chicago of grain during each of said two years of 1900 and 1901, and, of such receipts in Chicago, less than 20 per cent. inspected up to grades of grain which could be delivered upon time contracts made by said sales and purchases in the pits. It is also true that a decrease in the total grain productions of the United States does not cause a proportionate decrease in the volume of business done in the 'pits' of the complainant association, but, on the contrary, such business is larger during a year in which there is a shortage in the grain crop.

"Under the rules, usages, and practice of the complainant association, all time contracts made in the 'pits' are carried until it is possible to close them as between members of the complainant association by either one of three methods of settlement, namely, the method called 'direct settlement,' the method called 'rings' or 'ringing out,' and the method of delivery by delivering warehouse receipts physically or 'by notice.'

"Most time contracts made in the 'pits' are adjusted as between members of the complainant association, before the specified time of delivery arrives, by either the first or the second of the above-named methods. Direct settlements are effected by offsetting similar contracts at the close of the business hours of each day in the following manner: As soon as is practicable after the close of business in the 'pits,' each broker (individual, firm, or corporation) conducting business in the 'pits' takes from the day's transactions on his books the contracts similar as to amount and time of delivery to counter contracts made with other members of the complainant association, and ascertains therefrom the difference of the aggregate prices of such similar contracts, and, if

the difference be in his favor, the amount of such difference is charged to the other party in such counter contracts, and, if the difference is against him, such difference is credited to the other party to such counter contract. The following is a simple illustration: If, during the day, broker A. has sold to broker B. 5,000 bushels of December wheat at 75 cents per bushel, and broker B. has sold to broker A. 5,000 bushels of December wheat at 76 cents per bushel, after offsetting the contracts at 75 cents per bushel, there is a difference in B.'s favor of one cent on each bushel, or $50. This offsetting difference in cash is placed as a debit or credit, as the case may be, upon the clearing house sheet, hereinafter described, of the respective brokers, parties to said counter or offsetting contracts.

"The 'ring' method of settlement is as follows: Each broker (person, firm, or corporation) conducting business in the 'pits' has an employé who is called a 'settlement clerk,' who keeps a record of all his employer's transactions in the 'pits.' The complainant association furnishes a room wherein all of such settlement clerks meet at stated hours each day and compare their respective books, called 'settlement books,' which are required by the complainant association to be kept by each broker. Upon comparing their respective books, said settlement clerks ascertain what, if any, outstanding time contracts may be offset by some other corresponding time contract made by the parties with other members of the association, and which of such contracts are, by consent of the parties thereto, permitted to be offset, and thereupon, under the rules of the complainant association, are deemed to have been settled, provided the requirements of sections 6, 7, 8, and 9 of rule 22 of the complainant association are met, as therein provided, with reference to the clearing-house sheet and other details of settlement therein specified. * * *

"Theoretically, and in bare outline, an illustration of the 'ringing out' method is as follows: Broker A. sells to broker B. 5,000 bushels May wheat, broker B. sells to broker C. the same amount, broker C. sells to broker D. the same amount, and broker D. sells to broker A. the same amount; by consent of brokers A., B., C., and D., all of these time contracts are deemed discharged, and by novation there is substituted a contract wherein broker A., the initial seller in the series of discharged contracts, sells to broker D., the last buyer in the series of discharged contracts. The clearing-house sheets of the complainant association in evidence in this suit show that the actual process of 'ringing out' time contracts by elimination and substitution is much more complicated than the outline illustration, but that illustration exhibits the principle of the process. Among the daily transactions in complainant's 'pits' there are 'hedging' contracts, 'spreads,' and 'scalping' contracts, and all of these forms of time contracts are adjusted by both the 'direct' method and the 'ring' method of settlement. Upon the question what part of all the transactions in the pits are adjusted by the 'direct' method and the 'ring' method of settlement, the evidence is not very satisfactory. It tends to show, however, and I accordingly so find, that at least three-fourths of the total transactions in the pits are adjusted by the 'direct' and 'ring' method of settlement.

"In the event that said time contracts cannot be settled by either the 'direct' method or the 'ring' method, they are and must be closed by a third method, namely, delivery under the rules and usages of the complainant association. Said rules are as follows:

" 'Rule 21—Section 1. All deliveries upon contracts for grain or flax seed unless otherwise expressly provided, shall be made by tender of regular warehouse receipts.' * * *

"The rules of the complainant association do not permit any persons other than members of said association to make 'time' contracts upon the floor of the exchange hall, and all 'time' contracts made in the pits are contracts between the members of the complainant association, who are in said transactions respectively sellers and buyers. The rules of the complainant association permit members of said association, as between themselves and nonmembers, to act as brokers in 'time' contracts made in the pits. In case a member of the complainant association, in making a 'time' contract in the pits, acts as a broker for an undisclosed principal, if such contract is settled by either the 'direct' method or the 'ring' method, such settlement does not discharge it, so

far as such undisclosed principal is concerned, as between him and his broker, but the latter is required under complainant's rules to substitute a duplicate 'time' contract with the two elements of identity, namely, like amount of grain or other commodity, and like date of delivery, but not like price. If such substituted contract is not a duplicate, but differs from the original in price, the broker becomes principal as to difference in the prices between the original and the substituted contract, and, if it is impossible for such broker to substitute either a duplicate or a similar time contract, the broker becomes principal as to the entire time contract, instead of the original principal with whom he as broker, in behalf of his own undisclosed principal, entered into said original contract.

"The system of 'hedging' in the pits has a commercial influence which is favorable both to the interest of the producer and the consumer, in that the large cash grain houses, which conduct transactions in complainant's exchange hall, by reason of the risk to them from market fluctuations being decreased through 'hedges,' are able to take and do take a smaller margin of profit, and thus they pay to the producer a higher price and sell to the consumer at a lower price. The person taking the side of such hedging contract opposite of that to such grain house is the person who assumes the risk.

"The 'direct' method of settlement and the 'ring' method of settlement is not only an advantage to the members of the complainant association, in that it relieves them from the responsibility of carrying their contracts with other members of the complainant association, but they have, added to this advantage, the benefit of the margins deposited with them by the undisclosed principals for whom they act as brokers. * * *

"Section 8 of rule 4 of the complainant association is as follows:

" 'Sec. 8. Any member of the association who shall be interested or associated in business with, or who shall act as the representative of, or who shall knowingly execute any order or orders for the account of any organization, firm or individual engaged in the business of dealing in differences on the fluctuations in the market price of any commodity—without a bona fide purchase and sale of property for an actual delivery—shall be deemed guilty of unmercantile conduct, which renders him unworthy to be a member of the association; and upon complaint to and conviction thereof by the board of directors, he shall be expelled from membership in the association.' * * *

"The complainant association has prescribed no method or means which shall be employed by members of said association for the purpose of ascertaining the intent of their respective customers with respect to the delivery or nondelivery of the commodity covered by any time contract.

"Every member of the complainant association acting in the pits as a broker for a nonmember customer requires from such customer a deposit as security in each transaction conducted by him, and this fact is within the knowledge of the directors and executive officers of the complainant association. The rules of the complainant association authorize the members of said association who act as brokers to charge broker's commissions in amounts fixed by such rules. One of such commission charges is expressed in part as follows:

" 'For the purchase or sale and for the purchase and sale of property for future delivery, whether the contract for purchase or for sale be first made as follows: * * *'

"Using a member of the complainant association as his broker, a nonmember thereof may become a party to a time contract as buyer or seller, and at any time before the date of required delivery he may become a party to another contract in which he takes the opposite side to that held by him in the first mentioned contract. Such counter or reverse time contract may be authorized in the same order which authorizes the first contract, by including in said order a so-called 'stop-loss' order. When such contracts are made they may be settled, and are often so settled, as between the member of the complainant association who acted as broker and his nonmember customer, by the payment of the difference between the contract prices. The fact that such is the custom is a fact well known to the directors and executive officers of the complainant association.

"The rules of the complainant association provide for settlements of time contracts made in the pits when the seller does not deliver the property on

the last day of the month of the stipulated delivery—the rules and usages of the complainant association fix such last day of the month as final day of delivery—by allowing the purchasers the privilege of electing: First, to consider the contract forfeited; second, to purchase the property on the market for account of the seller at 1:15 o'clock of the next business day; or, third, by requiring a settlement with the seller at the average market price of the property sold on the last day of the month of delivery."

The master drew conclusions favorable to appellant, and recommended a decree in accordance with the prayer of the bill.

The court, reviewing the matter on exceptions, sustained the master's findings of fact, except that the percentage of transactions in which no actual deliveries were made was nearer 95 than 75; but disagreed with the master's conclusions (125 Fed. 72), and dismissed the bill for want of equity.

Henry S. Robbins, for appellant.

Jacob J. Kern, Charles D. Fullen, John A. Brown, E. D. Crumpacker, Peter Crumpacker, E. D. Smith, and Bernard Koolly, for appellees.

Before JENKINS, GROSSCUP, and BAKER, Circuit Judges.

BAKER, Circuit Judge, after stating the facts as above, delivered the opinion of the court:

1. We deem it unnecessary to determine from the evidence whether the percentage of trades in which actual deliveries were made was 5 or 25. The finding of the one figure or the other would not prove what proportion of the remaining no-delivery transactions were gambling. Of these, an indeterminate number were "hedging contracts." If we felt called upon by the necessities of this decision to give a definite opinion of hedging, the record might well lead us to find that hedging is a manufacturer's or merchant's insurance against price fluctuation of materials, and no more damnatory than insurances of property and life, which in one sense are wagers that the property will not be destroyed during the term, and that the life will not fail in less than the expectancy in the actuaries' tables. The remainder of the no-delivery transactions were "speculative." But speculation is not unlawful. One may buy any sort of property to hold for a rise, one may contract to buy or sell property not in possession or in existence at the time, and lawful contracts may lawfully be canceled and settled in advance of the time of performance. If a contract, lawful in form, is entered into, it is lawful in fact even though one of the parties never intended to perform his part of it; that is, the intent that the lawful form shall cover a sham must be mutual to make it a sham. We think the court's conclusion that, because in 95 per cent. of the trades no deliveries were in fact made, it was intended that in those cases deliveries should not be made, and that the parties in 19 instances out of 20 were using the forms of lawful contracts to cover mere wagers on the future prices of commodities, is not warranted by the facts in the record. The "direct" and "ring" methods of settlement between members might cancel out nine-tenths of the bids back and forth between the members as agents, and yet every contract may have been perfectly legal and enforceable between the principals, and every principal satisfied by receiving a "substitute" contract. If a seller intended not to deliver, but to settle on differences if prices rose, the buyer who entered into the contract in good faith, and who desired to receive the property, could not force the seller to deliver.

In every such case there would be no delivery, but the buyer would have a valid cause of action. Undoubtedly gambling was going on in the exchange hall, but it was contrary to appellant's by-laws. Appellant was chartered by Illinois for a lawful and useful purpose, and the association adopted and promulgated suitable by-laws and rules. We think the record fails to show that the dominant feature of the members' dealings was unlawful, much less that appellant, as a creature of the state, was violating its charter, or was particeps criminis in what gambling the members carried on.

We do not, however, attach very much importance to the preponderating character of the transactions in the exchange hall, because, in our opinion:

2. The real subject-matter of the suit is the property right in the news, in the reports of prices. Even if it were true that 95 per cent. of the dealings in the exchange hall were wagers, the prices are the same for the transactions that are not wagers, and the quotations sent out show the figures at which honest dealers may secure contracts. Millers, grain buyers, elevator companies, govern their dealings by the market prices made in appellant's exchange hall. The news therefore serves, or, at least, is capable of serving, a useful purpose. So it seems to us immaterial what proportion of the transactions are wagers, since the prices made in the transactions are the prices that farmers and shippers can get, and since the news of the prices and the dissemination thereof are valuable to the community. News may be an object of lawful ownership though ninetenths of the things reported be unlawful.

3. Nor should the property in this case (the news, the continuous quotation of prices) be adjudged contraband because it is susceptible of bad uses as well as good. Gamblers in Indiana may settle their bets on prices according to appellant's quotations, and this quite irrespective of the fact, if it were the fact, that 95 per cent. of the transactions in appellant's exchange hall were lawful; just as Indiana grain dealers may make and settle their honest contracts on the basis of appellant's quotations, regardless of the fact, if it were the fact, that 95 per cent. of transactions reported were gambling. It seems to us, therefore, that the news, as news, is not without the pale of protection, and that the moral quality is chargeable solely to the user.

4. The property concerned in this suit not being contraband, should appellant be denied the writ of injunction, even if it were true that appellant permits gambling in its exchange hall? We think not. Suppose this noncontraband news were collected and disseminated by the Associated Press. If that company were complainant and "clean-handed," its right to an injunction, the case being proper in other respects, would not be doubted. But if complainant were a gambler or a thief, what then? We think our answer has been sufficiently stated in Fuller v. Berger, 120 Fed. 274, 56 C. C. A. 588:

"Equity is not concerned with the general morals of a complainant; the taint that is regarded must affect the particular right asserted in his suit. * * * If the defendant can do no more than show that the complainant

130 F.—33

has committed some legal or moral offense which affects the defendant only as it does the public at large, the court must grant the equitable remedy and leave the punishment of the offender to other forums."

In this case the appellees, citizens of Indiana, have never had any dealings with appellant respecting the quotations; they have not been misled or deceived by appellant in any way; and they certainly are no more concerned with or affected by appellant's violations of the common law or of the penal laws of Illinois than the general public.

In reaching our conclusion, we have given respectful consideration to the cases of Board of Trade v. O'Dell Commission Co. (C. C.) 115 Fed. 574; Board of Trade v. Donovan Commission Co. (C. C.) 121 Fed. 1012; Board of Trade v. Ellis (C. C.) 122 Fed. 319; Christie Grain & Stock Co. v. Board of Trade (C. C. A.) 125 Fed. 161—and regret that we are unable to concur therein. We have been aided by the opinion of Judge Hook at circuit (116 Fed. 944) in support of his decree in the Christie Case, which was reversed in 125 Fed. 161.

The decree herein is reversed, with the direction to enter a decree in appellant's favor in conformity to the prayer of the bill.