ASSOCIATED PRESS v. INTERNATIONAL NEWS SERVICE.

(Circuit Court of Appeals, Second Circuit. June 21, 1917.)

No. 270.

1. INJUNCTION ⬤❯63—SUBJECTS OF RELIEF —INDUCING BREACH OF CONTRACT.
   A membership news gathering association, such as the Associated Press, composed of members each of whom is, or represents, the publisher of a newspaper, is entitled to protection by injunction against acts of a competitor, inducing members to violate their contracts made by the charter and by-laws of the association, or the confidential relations created by their membership.

2. WORDS AND PHRASES—"NEWS."
   Facts, even after ascertainment, are not "news," unless they have that indefinable quality of interest which attracts public attention. Neither is news always synonymous with facts, in the sense of verity. The word "news" means no more (laying aside hoaxing and intentional falsehood) than apparently authentic reports of current events of interest.
   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, News.]

3. LITERARY PROPERTY ⬤❯1—PROPERTY ⬤❯2—SUBJECT-MATTER—NEWS.
   News, although not literary property, where it has a commercial value, is property, and as such entitled to legal protection.

4. NEWSPAPERS ⬤❯7—NEWS—PUBLICATION.
   The property right of a press association in news gathered from all parts of the world for distribution to its members for publication in different cities throughout the United States is not lost by publication in one or more localities, but such property remains in the association until all of its members have had the benefit of the service.

5. TRADE-MARKS AND TRADE-NAMES ⬤❯68—PROTECTION OF PROPERTY RIGHTS —NEWS.
   Complainant, the Associated Press, is a membership association for the gathering and distribution to its members, who are publishers of newspapers throughout the United States, of news, both foreign and domestic. It has no capital stock; but the expense of the service is borne ratably by the members. Defendant is a stock corporation, which gathers and distributes news to customers for profit. It induced certain members of complainant to give its agents access to news furnished by complainant, and also copied foreign news items furnished by complainant from bulle-

⬤❯For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

tins and early editions of New York papers, and the news so obtained it sent out by wire to customers further west as its own. *Held*, that such acts were a fraudulent invasion of complainant's property rights, in the nature of unfair competition, against which complainant was entitled to an injunction.

6. Words and Phrases—"Publication."

The thought running through all the uses of the word "publication" is an advising of the public; a making known of something to them for a purpose.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Publication.]

Ward, Circuit Judge, dissenting in part.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the Associated Press against the International News Service. From an order granting a preliminary injunction, both parties appeal. Modified.

For opinion below, see 240 Fed. 983.

Cross-appeals from order entered in District Court for Southern District of New York granting in part only the preliminary injunction moved for by plaintiff.

The writ in question (reduced to its lowest terms) restrains defendant from (1) procuring any agent or employé of plaintiff, or any of its members, to give or permit defendant to take, for a consideration or otherwise, any "news" received from or gathered for plaintiff, and from using or selling "any news so obtained." The injunction as granted also (2) enjoins defendant from procuring any newspaper represented by a member of plaintiff to violate any agreement established by the charter or by-laws of plaintiff. Defendant alleges as error the issuance of the writ above outlined.

Plaintiff's motion for relief asked for what the court below granted, and further that defendant be enjoined from "copying, transmitting, selling, using, or causing to be copied, etc., any of the news furnished by plaintiff, from bulletins or newspapers published by a member" of plaintiff, and also from "competing with plaintiff" or its members by the unfair methods set forth in the bill. Injunction in substantially this form having been refused, plaintiff's appeal assigns such refusal for error.

Plaintiff is chartered by New York, under a general statute known as the Membership Corporation Law (Consol. Laws, c. 35); an act used for the organization of clubs and the like. It has no capital stock, its membership is selective, its business is the gathering of news all over the world, and the very great expense of such acquisition and transmission of information is borne by ratable levy or assessment upon its "members." Such members are practically about 950 newspaper owners distributed over the United States; but, since such owners are frequently corporations, each corporate contributor must furnish a natural person to act as the legal member of this New York corporation. Such natural person is commonly called the "representative" of whatever newspaper he serves.

Defendant is a business corporation of New Jersey, has capital stock, is engaged as a rival in the same business as plaintiff, and seeks a profit by selling the news or information it acquires to customers, usually newspaper publishers.

Some publications are members of the Associated Press, and also customers of the International; but such double service is unusual. The parties hereto are undoubtedly in keen competition, as are usually the journals served by one or the other in any given city.

News received at a principal office of plaintiff is disseminated by telegraph or telephone to members at a distance, and (in the largest cities at all events) the offices of journals taking the fullest or largest Associated Press

service contain a machine (furnished by plaintiff) of the printing telegraph type whereon the incoming news is shown automatically.

Every newspaper has, of course, a staff for the investigation of local happenings; if such paper is a member of plaintiff, it may be required to furnish to other members and through plaintiff the news of its locality. This is an important part of the Associated Press scheme of news acquisition, viz. the co-operative feature.

Plaintiff's by-laws explicitly forbid any member from imparting to any one Associated Press news "in advance of publication," or to "conduct his business in such a manner" that such news so furnished to him "may be communicated to any person, firm, corporation, or association not entitled to receive the same"—i. e., any one not in good standing with and in the Associated Press. The by-laws fix times of the day before which publication of members' newspapers shall not occur, but the exhibition of bulletins at its offices within each paper's own territory is not a violation of these rules.

The business of gathering, stating, transmitting, and selling statements of fact as "news" did not originate with either party hereto, and the general methods of journalists in regard to this department of activity are not in dispute, although (as appears hereafter) argument is hung on one old prevalent and undisputed habit of newsgatherers.

The principal facts upon which the court below based the first head of injunction are that in Cleveland, Ohio, is published a newspaper which has Associated Press membership, and had for a considerable time in its employ a "telegraph editor," who would naturally receive incoming Associated Press items. This man (in accordance with by-laws) was charged with the transmission to plaintiff of Cleveland news possessed of more than local interest, and (properly) received pay from plaintiff for so doing. Defendant corrupted this editor to apprise its agents of what he thus learned, and disseminated such news as the result of its own legitimate labor.

The second head of injunction is based on the fact that there is in New York City a newspaper which has the service of both plaintiff and defendant. In its publication office is one of the printing telegraph machines aforesaid, and the managers of said newspaper were induced to permit agents of defendant to enter their office, read what was "coming in" on the machine, and use the information thus acquired as the basis for telegraphic and other items, represented as the gatherings of its own employés from original sources, or at least they were not otherwise marked or described.

The material facts on which plaintiff moved for such injunctive relief as was refused below are undisputed and as follows:

The natural place for receiving news from Europe (and indeed beyond) is the Atlantic seaboard, and especially New York. Bulletins and early editions, put out by members of plaintiff in the seaboard cities, are read by agents of defendant, and the substance thereof transmitted by wire westward, sold to defendant's customers, and by them printed, perhaps without any knowledge on their part that the origin of and sole basis for defendant's dispatch is (e. g.) a bulletin posted in New York by a member of plaintiff, as the result of plaintiff's efforts, and certainly without any such information given them by defendant. That this practice obtains the answer admits, and justifies the same as matter of law, while alleging (in substance) that it is no more than a part or legitimate outgrowth of the newspaper habit of utilizing "tips."

This word signifies a bare intimation that something has happened. When such "tip" has been verified by independent investigation on the part of the person receiving it, the facts may be and are disseminated as discovered by the journal or news agency getting the "tip." This practice may, we believe, be regarded as universal in newsgathering circles. The District Judge did not consider the utilization of "tips" as having any necessary bearing on the bodily appropriation and sale of news from early editions and bulletins, and felt satisfied that as matter of law plaintiff should have all the relief demanded, but, regarding this last question as to the effect of "publication" by an Associated Press paper as one of first impression, refused the third demand of plaintiff, and remitted the matter to this court.

Peter S. Grosscup, of Chicago, Ill. (Fred. B. Jennings and Winfred T. Denison, both of New York City, on the brief), for plaintiff.

Samuel Untermyer and William A. De Ford, both of New York City (Henry A. Wise, of New York City, on the brief), for defendant.

Before WARD, ROGERS and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above).  Defendant does not admit the facts above stated, as to procuring news from a telegraph machine in the office of a publisher; we think them fairly and fully proven.  The evidence adduced for the defense on all the other points above mentioned amounts to an assertion that what defendant is accused of wrongfully doing plaintiff itself does and has done, and it is, indeed, a part of the newsgathering trade.  Upon these propositions of fact are rested the conclusions that (1) if the acts are wrong, plaintiff cannot ask relief in equity when its own hands are unclean; and (2) if they are not wrong, i. e., illegal, no ground for relief exists.  In our opinion the facts concerning the Cleveland episode are proved as stated; the plaintiff does not and has not copied and sold news from bulletins, etc., of papers using defendant's service; and the "tip" habit, though discouraged by plaintiff, is incurably journalistic.

[1] If the facts are as we have now found them, no party asserts that the acts restrained by the injunction as issued can be justified, either in law or morals.  The right to proceed in equity to restrain inducing to breach of contract we have recognized in American, etc., Co. v. Keitel, 209 Fed. 351, 126 C. C. A. 277; and the inequity of seeking profit by procuring the breach of any confidential relation by an employé is fully considered in Peabody v. Norfolk, 98 Mass. 452, 96 Am. Dec. 664, and Dodge Co. v. Construction, etc., Co., 183 Mass. 62, 66 N. E. 204, 60 L. R. A. 810, 97 Am. St. Rep. 412.  The relations (inter sese) of the members of the Associated Press are quite as confidential as those of master and trusted servant; the same reasoning applies. The order, so far as attacked by defendant's appeal, we consider granted in the fair exercise of discretion, and therefore proper.

Plaintiff's appeal, being from a refusal to grant injunction pendente lite, is of an infrequent kind; but still more rare is the presentation by such appeal of a clear-cut question of law, upon undisputed facts, largely admitted in the pleadings.  These facts enable us to render opinion without danger of even seeming to trench upon discretionary matters. We are practically requested to act by the District Court itself.

There is no difficulty in discriminating between the utilization of "tips" and the bodily appropriation of another's labor in accumulating and stating information.  As a matter of fact, one who, on hearing a rumor or assertion, investigates and verifies it, whether with much or little effort, acquires knowledge by processes of his own; the result is his.  In all the relations of life, most of what most of us say we know is but the result of verifying "tips," given, consciously or unconsciously, by those in our environment.  As a matter of law or rule, it is impossible to say in advance what measure of investigation or verification must satisfy the censor, and the law does not seek to compel the vain or impossible.  Doubtless there have been, and will be again, instances where

the asserted or pretended investigation is but an excuse for appropriation, where no reasonable man would believe that any effort had been made, except to conceal the absence of original work, but no such case is before us.

What is before us, and on the pleadings, is whether it is lawful, and, if unlawful, whether equity affords a remedy, for the admitted practice or habit of appropriating from bulletins and early editions the result of plaintiff's labors, and selling or otherwise gainfully using the same, either in the plaintiff's form or after passing it under the hand of a "rewrite" man. This adjective is the trade description of one who changes the language or sequence of some composition of words; his labors do not change the substance, and are immaterial to the present controversy.

Defendant justifies bodily appropriation without independent investigation, because (1) all plaintiff ever has in possession or for communication are facts; (2) all defendant takes are facts, and (3) there can be no property in facts; but (4) if there be any such property it is lost at the moment any member of plaintiff, in accordance with its own rules, publishes said facts by showing a bulletin or distributing an edition.

Plaintiff replies that it is (a) untrue that facts alone constitute its stock in trade; it deals in news; and (b) in news there is a property right recognized by reason and authority. Further (c) such property right inures to and persists in the plaintiff entity and each one of its members, and (d) is not exhausted by the act of a single member, which act is (e) improperly called by defendant "publication," a word inappropriate to "news," which is not literary property. Finally (f) plaintiff complains of defendant's admitted practices as unfair competition.

[2] (1, 2, a) With the existence of a truth, with physical facts per se, neither plaintiff nor defendant is concerned; for them facts in that absolute sense are but as ore in a mountain or fish in the sea—valueless unless and until by labor mined or caught for use. Nor are facts, even after ascertainment, news, unless they have that indefinable quality of interest, which attracts public attention. Neither is news always synonymous with facts, in the sense of verity; indeed, much news ultimately proves fictitious, yet it is excellent news notwithstanding. The word means no more (laying aside hoaxing and intentional falsehood) than apparently authentic reports of current events of interest.

When one copies a statement from a bulletin, he cannot assert himself to be possessed of any certain fact other than that of his own appropriation. The only fact he knows is that the bulletin maker made an assertion; but he has taken the news, because that is what the bulletin proclaimed, if its maker was skillful in his business.

[3] (3, b) Whether there is or can be any property in facts per se, any more than there is in ideas or mental concepts, is a metaphysical query that can be laid aside; for there is no doubt, either on reason or authority, that there is a property right in news capable of and entitled to legal protection. Property, nomen generalissimum, covers everything that has an exchangeable value (The Slaughter House Cases, 16 Wall. 127, 19 L. Ed. 915); that news possesses the quality stated,

seems obvious enough, when it is observed that defendant takes it, in order to exchange it against dollars.

Special or trade news of divers kinds constitute property, as has often been decided (Hunt v. Cotton Exchange, 205 U. S. at 322, 27 Sup. Ct. 529, 51 L. Ed. 821; Dr. Miles Co. v. Park, 220 U. S. at 402, 31 Sup. Ct. 376, 55 L. Ed. 502; Board of Trade v. Christie Co., 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031, affirming Board of Trade v. Kinsey, 130 Fed. 507, 64 C. C. A. 669, 69 L. R. A. 59, and citing with approval National Telegraph, etc., Co. v. Western Union Co., 119 Fed. 294, 56 C. C. A. 198, 60 L. R. A. 805; Dodge Co. v. Construction, etc., Co., 183 Mass. 62, 66 N. E. 204, 60 L. R. A. 810, 97 Am. St. Rep. 412; Exchange, etc., Co. v. Central, etc., Co., 2 Chan. [1897] 48; Kiernan v. Manhattan, etc., Co., 50 How. Prac. [N. Y.] 194; Board of Trade v. Cella, etc., Co., 145 Fed. 28, 76 C. C. A. 28); and the point was assumed as settled by us in Board of Trade v. Tucker, 221 Fed. 305, 137 C. C. A. 255.

There is no distinction entailing a legal difference, between news of the prices of corporate securities or commodities, of sporting events, or opportunities of profitable contracting, and news of current political, social, or national events. Both require labor and expense in acquisition, transmission, and dissemination, both have exchangeable values, and all alike lose by exposure the quality of news, which, when it becomes history, may remain important, but its commercial value has largely gone.

In the National Telegraph Case, 119 Fed. 300, 56 C. C. A. 198, 60 L. R. A. 805, the property rights of the "great news agencies" were referred to as existing for the same reasons as obtained in respect of market quotations, and, as we have indicated, that decision was approvingly cited by the Supreme Court in the decision which we think settled the general proposition that all news as commercially sold is property. 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031.

Assuming, now, the existence at some time of some property right in plaintiff and to its news, the qualities producing exchangeable value may be noted. Regularity and reliability, the fruits of organization and expenditure, are of course necessary; but all that is vain unless the news is fresh, early, and, if not always first in point of time, as prompt as any. Time is of the essence, and the basic question on this branch of the discussion is: How long does the property quality endure in news?

[4] (4, c, d, e) Plaintiff is a membership corporation, its members co-operate in newsgathering, and each has in his own locality a several right to and ownership in the results of plaintiff's labors, viz. the news. The rights of members, whether printing in Duluth or Galveston, New York or San Francisco, are equal, and the aggregate of their rights is the plaintiff's right. If it be admitted that plaintiff's right of property in its news once existed, such existence was for the benefit of all its members, who, however (owing to the earth's method of rotation), cannot simultaneously exercise their several rights. Yet all exercise them at the same hour of their several days.

It is sought, if not to limit the doctrine of property in news to the time during which it remains locked up in the breast of its gatherer,

to interpret the decisions cited as meaning only that news is "like a trade secret" (198 U. S. 250, 25 Sup. Ct. 637, 49 L. Ed. 1031), lost when divulged in the course of business. Doubtless the analogy of restraining in equity wrongful knowledge of private business methods was very useful in developing the doctrine that the "courts ought to protect in every reasonable way" the "valuable right of property" in information. Dodge Co. v. Construction, etc., Co., supra. But news is far more than a trade secret, for that must remain private to have its best value, while news is obtained for publicity alone. The true line of decision is indicated by the conclusion of the court in the Christie Case—that the "information will not become public property until the plaintiff has gained his reward." 198 U. S. 251, 25 Sup. Ct. 637, 49 L. Ed. 1031. Of course, this means his reasonable reward, and, as in that instance of trade quotations, divulging the same to one patron's office full of customers did not reasonably terminate plaintiff's property, so here it is reasonable and just that each member of plaintiff and plaintiff itself should have a property right in its news until the reasonable reward of each member is received, and that means (with due allowance for the earth's rotation) until plaintiff's most Western member has enjoyed his reward, which is, not to have his local competitor supplied in time for competition with what he has paid for. Surely this is a modest limit of rights.

But the foregoing is thought to be avoided, if not controverted, by dwelling on the word "publication," and insisting in substance that when (e. g.) a single New York paper (being a member of plaintiff) prints an item and sells a copy of that edition, all the world can copy as it pleases, to any extent and for any purpose, commercial or otherwise, because nothing but copyright protects that paper, and copyright does not cover statements of fact, but merely their literary dress or form.

[6] The argument assumes that what plaintiff is interested in, and is trying to preserve, is literary property, or anything capable of copyright protection. It may be granted that the newspaper first giving out the news in question is copyrighted, that fact statements are not thereby protected as such, and that publication at common law terminated an author's rights in his manuscript and the fruits of his brain;[1] yet it still remains true that plaintiff's property in news is not literary at all, that it is not capable of copyright, and that "publication," as that word is used in the long line of decisions regarding literary rights, has no determinative bearing on this case. No one before ever attributed to publication a sense that would limit a lawful business to a few degrees of longitude. The word is legally very old, and of no one certain meaning. Publication of evidence in equity or admiralty, of banns, of libel, etc., bears but remote relation to the act which is thought once to have terminated an author's property, and now is a requisite to statutory copy-

---

[1] This is the general view. Werckmeister v. American, etc., Co., 134 Fed. 321, 69 C. C. A. 553, 68 L. R. A. 591; Tribune Co. v. Associated Press (C. C.) 116 Fed. at 127; Holmes v. Hurst, 174 U. S. 85, 19 Sup. Ct. 606, 43 L. Ed. 904. The opposite opinion is divertingly sustained by Mr. Augustine Birrell in "Authors in Court," found among "Res Judicatæ."

right. The thought, however, running through all the uses of the word, is an advising of the public, a making known of something to them for a purpose. It follows that the crucial inquiry is as to that purpose: Is it lawful?

In all the "quotation" cases, it was held that the purpose of the publicity given was not to let other people sell the quotations, and that that purpose was lawful.[2]  As we put it in the Tucker Case, 221 Fed. 307, 137 C. C. A. 255:

"The posting of  *  *  *  quotations on a blackboard  *  *  *  is not the sort of publication which will terminate complainant's property right in them."

Thus it appears that not all publications are alike, and this is true, even under the Copyright Acts. In Werckmeister v. American, etc., Co., 134 Fed. 321, 69 C. C. A. 553, 68 L. R. A. 591, an opinion by Townsend, J., of which it has been said that it "left little to be added to the discussion" (American Tobacco Co. v. Werckmeister, 207 U. S. 299, 28 Sup. Ct. 72, 52 L. Ed. 208, 12 Ann. Cas. 595), that learned judge said that the use of "publication" without explanation or qualification was unfortunate. "The nature of the property in question in large measure determines the extent of public right." And it was held that unless there was an "abandonment of copyright or dedication to the public," the owner of a thing capable of copyright could "expressly or by implication confine the enjoyment of such subject to some occasion or definite purpose."

We have assumed the newspaper first printing to be copyrighted, and no doubt its publication of its early edition was a general publication; but it could not copyright, abandon, nor destroy what it did not own, and it did not own plaintiff's property in the news, nor that of its own fellow members in California. It did own the right to print in New York, but we discover no magic in the word "publication" which takes away or terminates the rights of others.

Plaintiff's purpose in furnishing the (e. g.) New York paper with news was to have a use made of it not inconsistent with its own reasonable reward for its labor from its property and that of all the other members of plaintiff. That measure of use and reward is lawful; defendant deprives plaintiff thereof, and can show no equities; therefore defendant should be enjoined.

[5] (f) Unfair competition, like all oft-uttered legal phrases, has acquired rather a narrow use. In McLean v. Fleming, 96 U. S. 251, 24 L. Ed. 828, a decision which is near the foundation of American case law on this subject, it was said that what equity enjoins the wrongdoer from depriving another of is "the advantage of celebrity." This thought has led to the feeling that what a plaintiff must be robbed of is the good will and business ease resulting from his well-known name, or the attractive dressing, wrapping, or form of his product; that such robbery must be by imitation; and that the test of such imitation is the effect upon the public, or that part thereof likely to require wares such as those in controversy.

[2] Board of Trade v. McDearmott (C. C.) 143 Fed. 188, is probably the most extreme instance of publicity, not amounting to abandonment, i. e., to the kind of "publication" here contended for.

But this is not all the law, nor the only sort of unfairness in business methods, practiced by a competitor, and resulting in a continuing tort, for which the law affords no adequate remedy—that comes under the condemnation of equity. If defendant appropriated from an early edition of a New York paper what it wanted, and sold it, as extracted from said newspaper or as obtained per Associated Press, such action would still be obnoxious to what we have said concerning plaintiff's property rights in the news procured by itself; but, since no deception would be wrought upon the public, no action for unfair competition would lie along the lines just indicated. When and if such appropriated news is sold as the fruit of defendant's own efforts, and under its own name, it is a plain case of deception, assuming defendant's customers to be honorable men, anxious for good wares; an assumption necessarily made, in the absence of evidence to the contrary. Yet an action of such nature would lack the element of imitation, usually relied upon.

Equity, however, is not stayed because a name does not fit, or one is not at hand to accurately describe a wrong of a kind necessarily infrequent. If defendant takes what some one else owns, and sells it as of right, in rivalry with the owner, such competition is more than unfair; it is patently unlawful and the wider term comprises the narrower. But, laying aside the right of property as the ultimate foundation of suit, the business method of selling, in competition with plaintiff and its members, something falsely represented as gathered by defendant otherwise than from bulletins and early editions, is unfair, because it is parasitic and untrue. It is immoral, and that is usually unfair to some one.[3]

The flexibility of equity in granting relief against unfair methods of business was well stated by Ingraham, J., in Burrow v. Marceau, 124 App. Div. 665, 109 N. Y. Supp. 105:

"No hard and fast rule can be laid down, * * * where it is clearly established that an attempt is being made by one person to get the business of another by * * * fraud and deceit a court of equity will" intervene.[4]

And in Weinstock v. Marks, 109 Cal. 529, 42 Pac. 142, 30 L. R. A. 182, 50 Am. St. Rep. 57, it was said:

"Equity does not concern itself about the means by which wrong is done; it deals with the result of the fraud, which moves the arm of the law and strikes down all efforts, where fraud is practiced in securing the trade of a rival dealer."

To commercially distribute news not gathered by the sender is under the facts shown here an invasion of property rights; to send it out as one's own labor is marked by that dolus which is fraud, and that is the basis of the doctrine of unfair competition in its wide sense.

---

[3] Decisions granting relief from competition without the usual imitation elements, but with the fraud apparent, are Morgan v. Wendover, 43 Fed. 420, 10 L. R. A. 283; American, etc., Co. v. De Lee, 67 Fed. 329; Barnes v. Pierce (C. C.) 164 Fed. 213; Fonotipia Co. v. Bradley (C. C.) 171 Fed. 951; Prest-o-Lite v. Davis (C. C.) 209 Fed. 917, affirmed 215 Fed. 349, 131 C. C. A. 491; Prest-o-Lite v. Heiden, 219 Fed. 845, 135 C. C. A. 515, L. R. A. 1915F, 945.

[4] See this principle applied to enjoin a competitor from imitating the fashion of a model gown, bought from plaintiff by pretending to be an intending wearer. Montegut v. Hickson, 164 N. Y. Supp. 858.

Since (to summarize the matter) any bodily taking for sale of plaintiff's news, without other labor than the perception thereof, before the reasonable reward of industry is secured as above indicated, is an unlawful invasion of property rights, and any sale thereof in competition with plaintiff under pretense of individual gathering thereof is a tort of the nature of unfair competition, the plaintiff's motion for injunction should have been granted substantially as made.

The order appealed from is modified, as indicated, and the cause remanded, with directions to issue injunction against any bodily taking of the words or substance of plaintiff's news, until its commercial value as news has, in the opinion of the District Court, passed away. The exact form of words to be used, and the insertion or omission of a definite time limit on copying  and sale, will be settled in the court below in any manner not inconsistent with this opinion.    One bill of costs in this court to plaintiff.

WARD, Circuit Judge (dissenting in part).    A distributor of news —that is, of his information about things that have happened—neither invents, nor composes, nor manufactures anything; nor does he supply something which the public buys because it believes it originates with him and wants his article; nor does he own the news, but only his knowledge of the news.    Therefore analogies from property created or protected by the patent, copyright, or trade-mark statutes, or by the principles regulating unfair competition, are wholly inapplicable.    The distributor's knowledge of news which he has gathered is his property, so long as he keeps it to himself or communicates it only to others on condition that they will do so.    He will be protected against any one who surreptitiously obtains this information from one of his members, subscribers, or employés, or by any form of pilfering or unfair means.    Such were the cases of Kiernan v. Manhattan Co., 50 How. Prac. (N. Y.) 194; Exchange Co. v. Gregory, 1 Q. B. D. (1896) 147; Exchange Co. v. Central Co., 2 Chancery (1897) 48; Peabody v. Norfolk, 98 Mass. 452, 96 Am. Dec. 664; Dodge Co. v. Construction Co., 183 Mass. 62, 66 N. E. 204, 60 L. R. A. 810, 97 Am. St. Rep. 412; Board of Trade v. Hadden Co. (C. C.) 109 Fed. 705; National News Co. v. W. U. T. Co., 119 Fed. 294, 56 C. C. A. 198, 60 L. R. A. 805; Illinois Commission v. Cleveland Tel. Co., 119 Fed. 301, 56 C. C. A. 205; Board of Trade v. Christie, 198 U. S. 236, 25 Sup. Ct. 637, 49 L. Ed. 1031; Board of Trade v. Cella, 145 Fed. 28, 76 C. C. A. 28; Board of Trade v. Tucker, 221 Fed. 305, 137 C. C. A. 255; Hunt v. Cotton Exchange, 205 U. S. 333, 27 Sup. Ct. 529, 51 L. Ed. 821.    In every one of these cases the court found that the defendant got the news or the quotations surreptitiously, and enjoined him for that reason.    They abundantly support an injunction on the first grounds mentioned in the opinion of the court.

But if the distributor publishes, to use a word in this connection which I think has been unreasonably criticized, or abandons or dedicates or communicates his information to the world, his right of property in his information and his right to be protected against the

use of it is gone. The Supreme Court in the Christie Case, supra, 198 U. S. 250, 25 Sup. Ct. 637, 49 L. Ed. 1031, likened property in news to property in trade secrets. The two are strikingly similar. The owner of a trade secret will be given protection against any breach of confidence in respect to it by his employés and against any dishonest discovery of it by third parties. If, however, he communicates the secret to another without condition, or if any one by his own efforts, for instance, by analysis of a secret compound, learns how it is made, such person may use it without any accountability to the original discoverer. That the discoverer spent much time and money in discovering the secret would not be regarded as a reason why such persons, learning it honestly, should not make use of it.

. In this case the complainant furnishes news to its members for the express purpose of their putting it on their bulletin boards and issuing it to the public in their newspapers. This is what they live on. After this it seems to me pure fiction to say that any property in the distributor survives. Everything in the nature of a confidence about the communication has ceased. That the rotation of the earth is slower than the electric current is a physical fact the complainant must reckon with in doing its business. That news dedicated to the public with the complainant's consent by the morning newspapers in New York can be telegraphed in time to appear in the morning newspapers of San Francisco cannot qualify the legal effect of the dedication.

There being not the least evidence of anything fraudulent or underhanded in this method of obtaining news, I think the injunction should be denied.