[Civ. No. 11864. Second Appellate District, Division One.—October 30, 1939.]

JACK METTER, Appellant, v. LOS ANGELES EXAMINER et al., Respondents.

G. A. Bisbee, Harold R. Spence and Max Tendler for Appellant.

Lawler, Felix & Hall, John M. Hall and A. Laurence Mitchell for Respondents.

WHITE, J.—Plaintiff filed a complaint in the court below seeking damages against the defendants for trespass, conversion, and for the violation of his right of privacy. With the issues framed by appropriate pleadings, the cause proceeded to trial before a jury. At the conclusion of plaintiff's case the defendants, without offering any testimony, also rested their case, and thereupon moved the court for a directed verdict in favor of each of such defendants. Following the granting of such motion and the entry of judgment thereon, plaintiff prosecutes this appeal from such judgment.

Epitomizing the facts alleged in the amended complaint and proven at the trial, the record discloses that on February 1, 1935, Mrs. Metter, the wife of plaintiff, committed suicide by plunging from the twelfth floor fire-escape of an office building in downtown Los Angeles. Learning of the tragic death of his wife upon his return home from work, plaintiff went to the coroner's office, where he encountered some newspaper reporters while viewing the body of his wife. Following a conversation with one of the reporters, plaintiff went to his home, and upon entering the house discovered that the screen to the kitchen window had been forced open and that a photograph of his wife which had been on the living-room table when he departed for work in the morning was missing. Following a telephone conversation with someone in the editorial rooms of the defendant Los Angeles Examiner, plaintiff went personally to the Examiner building, arriving there about 8 P. M., when he had a conversation with defendant Harry H. Morgan, night city editor of the paper, wherein plaintiff advised Mr. Morgan of his identity, that he was the party who had theretofore telephoned regarding the disappearance of his wife's picture; that he did not want anything printed in the paper about the death of his wife; that her picture had been stolen from his home and that he did not want the picture printed or reproduced in the newspaper; and that he knew "they" had the "picture". Defendant Morgan then advised plaintiff that he had nothing to do with the matter; that the day city editor was in charge at the time of Mrs. Metter's death; but that if plaintiff would return in a short time, he, Morgan, would contact the day city editor concerning the matter. When plaintiff returned to meet defendant Morgan the latter told plaintiff that the day city editor knew nothing

of the picture; that the paper had a story of Mrs. Metter's death, and that the paper had a copy of a photograph of Mrs. Metter, but that the photograph itself was in the possession of the homicide squad of the police department. After again admonishing defendant Morgan as night city editor that he did not want the stolen photograph reproduced in the newspaper, plaintiff departed. It was conceded at the trial that there were five major editions of the Los Angeles Examiner during the late afternoon and evening of February 1, 1935, and the early morning of February 2d, all of which bore the last-named date. It was agreed that in one of the editions of the paper which went to press several hours after the plaintiff talked with defendant night city editor, there appeared an account of the suicide of plaintiff's wife with a picture of her, together with a picture of a building court into which had been drawn the figure of a body falling headlong to the ground. The picture of plaintiff's wife appearing in the newspaper was identified by plaintiff as being a likeness of his wife, having the same characteristics and being similar in appearance to the picture allegedly stolen from plaintiff's home. The evidence indicates that the picture of plaintiff's wife did not appear in two earlier editions of the newspaper known as the 5 and 7:30 o'clock editions. Mention of this fact is made for the reason that appellant contends therefrom that when he talked with defendant night city editor Morgan at about 8 P. M. the latter still had it within his power to prevent publication of the picture in accordance with plaintiff's demand.

■ With reference to the allegations of trespass and conversion, it is at once apparent from the foregoing narrative of the testimony that there was before the court no direct evidence that the Los Angeles Examiner or its representatives or agents either entered the premises of plaintiff or took therefrom the photograph of his wife. Nor is there any substantial evidence that the purloined photograph was ever in the possession of defendant newspaper or its agents. However, we are asked by appellant, as was the trial court, to infer that because a picture of his wife appeared in the Los Angeles Examiner defendants had possession of the missing photograph. This is urged upon the reasoning contained in cited cases (*People* v. *Taylor*, 4 Cal. App. (2d) 214, 217 [40 Pac. (2d) 870] ; *People* v. *Savage*, 14 Cal. App. (2d) 142 [57 Pac.

(2d) 973] ; *People* v. *Frahm,* 107 Cal. App. 253, 265 [290 Pac. 678]) to the effect that possession of stolen property, while not sufficient to connect a defendant with the perpetration of the theft, is nevertheless a circumstance which may be considered by the jury in connection with other evidence, and that unless such possession is satisfactorily explained it warrants an inference upon which guilt may be predicated. But the fallacy of such an argument in the case at bar is immediately apparent when we realize that it is based upon the assumption that the photograph which had been removed from appellant's home was in the custody or possession of the Examiner, when the record is barren of any evidence to prove either that the Examiner or its agents entered appellant's home or even had possession of the missing photograph. Appellant is in error when he says that the Examiner, through its agent and co-defendant, night city editor Morgan, admitted possession of the missing photograph. What defendant Morgan testified to was that the newspaper had a copy of *a* photograph of Mrs. Metter and that the photograph for which appellant was searching was with the homicide squad at the police station. In the case before us there is no evidence to refute the inference that the Examiner obtained its "copy" of the likeness of plaintiff's wife by preparing its own picture of such likeness from the photograph while the latter was in the custody of the Los Angeles police. At the trial plaintiff did not choose to place upon the witness-stand any witness from the police department as to whether the photograph was taken by the police or was in their possession as contended by defendant night city editor. An inference must be founded upon a fact legally proved and upon deductions to be drawn from such proven fact. Here the fact of possession of the missing photograph remained unproved, and consequently no inference of wrongdoing may be indulged in. There is a presumption that a person is innocent of crime or wrong. (Subd. 1, sec. 1963, Code Civ. Proc.), the benefit of which can only be destroyed by evidence. Upon the issues of trespass and conversion the defendants were entitled to a directed verdict.

Appellant next contends that conceding he could not recover against defendants on the trespass and conversion counts of his complaint, he is nevertheless entitled to recover for the violation by defendants of what has become known as "the right of privacy". This right appears to have been first dis-

cussed in a law journal essay in 1860. It did not, however, attract any considerable attention from the bench and bar until the year 1890, when an article was published in 4 Harvard Law Review, page 193, authored by Justice Brandeis and Samuel B. Warren. Following the advent of this essay a number of cases in which the so-called doctrine of the right of privacy was involved came before the courts of the various states. While the doctrine was accorded recognition in some jurisdictions, including California (*Melvin* v. *Reid*, 112 Cal. App. 285 [297 Pac. 91]), others have refrained from giving it effect. It is not necessary to present in detail a review of the decisions from other states in which the right was given consideration, because in *Melvin* v. *Reid, supra,* the court cites many cases from jurisdictions which have both approved and refused to accept the doctrine of the right of privacy.

In a number of states extending recognition to the doctrine of the right of privacy it has been defined as "the right to live one's life in seclusion, without being subjected to unwarranted and undesired publicity. In short, it is the right to be let alone. (21 R. C. L. 1197, 1198.) There are times, however, when one, whether willingly or not, becomes an actor in an occurrence of public or general interest. When this takes place he emerges from his seclusion, and it is not an invasion of his right of privacy to publish his photograph with an account of such occurrence." (*Jones* v. *Herald-Post Co.*, 230 Ky. 227 [18 S. W. (2d) 972].) It might appropriately be observed that "public or general interest" as used in the foregoing opinion is not to be confused with mere curiosity.

With reference to the fundamentals upon which the right of privacy exists, it is said in *Melvin* v. *Reid, supra*:

"A few general principles, founded on authority or reason, seem to run through most of the better considered decisions from jurisdictions which recognize the doctrine as well as those which do not. We may summarize them as follows:

"1. The right of privacy was unknown to the ancient common law.

"2. It is an incident of the person and not of property—a tort for which a right of recovery is given in some jurisdictions.

"3. *It is a purely personal action and does not survive, but dies with the person.*

"4. It does not exist where the person has published the matter complained of, or consented thereto.

"5. It does not exist where a person has become so prominent that by his very prominence he has dedicated his life to the public and thereby waived his right to privacy. There can be no privacy in that which is already public.

"6. *It does not exist in the dissemination of news and news events, nor in the discussion of events of the life of a person in whom the public has a rightful interest,* nor where the information would be of public benefit as in the case of a candidate for public office.

"7. The right of privacy can only by violated by printings, writings, pictures or other permanent publications or reproductions, and not by word of mouth.

"8. The right of action accrues when the publication is made for gain or profit. (This, however, is questioned in some cases.)" (Italics added.)

The following definition of the right in question is found in 21 Ruling Case Law, pages 1198 to 1200: "Violation of the right of privacy consists in the interference with another's seclusion by subjecting him to unwarranted and undesired publicity. . . . The violation of the right of privacy is a tort and the injured person is entitled to recover damages."

 A right of action for violation of one's right of privacy being purely a personal one, appellant must allege and prove an invasion of his own right of privacy before he can recover. In this connection it becomes unnecessary to discuss the cases cited by appellant wherein the courts have allowed recovery for the publication of a photograph where such publication was a breach of contract, or violation of a confidential relation (*Bazemore* v. *Savannah Hospital,* 171 Ga. 257 [155 S. E. 194]; *Douglas* v. *Stokes et ux.,* 149 Ky. 506 [149 S. W. 849, Ann. Cas. 1914B, 374, 42 L. R. A. (N. S.) 386]), because there was no contract, express or implied, or any relation of trust or confidence between either plaintiff, Mr. Metter, or Mrs. Metter, on the one hand, and the Los Angeles Examiner or any other defendant on the other hand. Notwithstanding the fact that the picture reproduced was that of appellant's deceased wife and that no reference was made to him in the printed newspaper article except that he was Mrs. Metter's husband and that he was quoted with reference to the causes to which he ascribed his wife's suicide, appellant argues

that his right to privacy was outraged by publication of the circumstances surrounding his wife's death. This claim he apparently bases upon the principle enunciated in *Fitzsimmons* v. *Olinger Mortuary Assn.*, 91 Colo. 44 [17 Pac. (2d) 535], where the court said: ''The exhibition of callousness or indifference, the offer of insult and indignity, can, of course, involve no injury to the dead, but they can visit agony akin to torture on the living.''

Whatever right of privacy Mrs. Metter had having died with her, we are nevertheless asked to recognize an asserted right by appellant to enforce a right of privacy which he himself possessed, based, as he says, upon what is denominated as a ''relational right'' of privacy, or in other words, a right to be spared unhappiness through publicity concerning another person because of one's relationship to such person. Neither by the pleadings, at the trial, nor on this appeal is there any complaint made of anything published which directly related to appellant; but nevertheless he claims a right to recover by reason of publicity relating solely to one who was related to him as his wife. In connection with appellant's claim in this regard, the holding by the District Court of Appeal in the California case of *Melvin* v. *Reid, supra,* to the effect that when the incidents of a life are so public as to be *spread upon a public record,* they come into the knowledge and into the possession of the public and cease to be private, has a direct application to the facts presented in the case before us. Mrs. Metter's death, to which publicity was given, and in connection with which her picture was published, immediately set in motion, pursuant to the provisions of section 1510 of the Penal Code, an investigation by the coroner. Manifestly an individual cannot claim a right to privacy with regard to that which cannot, from the very nature of things and by operation of law, remain private. When, therefore, the circumstances surrounding the demise of Mrs. Metter became by operation of law the object of an investigation by a public officer and also became the subject-matter of a public record, the publication of the facts in connection therewith violated no one's right to privacy. The manner of Mrs. Metter's death imposed upon the coroner the duty of making an official investigation as to the cause of death, with regard to which all relevant circumstances became the proper subject of official inquiry. The incident

described by respondent newspaper had to do with these circumstances, and therefore the publication thereof cannot be held to violate a right of privacy.

■ It is also recognized that the right of privacy does not prohibit any publication of matter which is of public or general concern; and while the general object in view is to protect the privacy of private life, nevertheless, ''to whatever degree and in whatever connection a person's life has ceased to be private, before the publication under consideration has been made, to that extent the protection is to be withdrawn''. (Brandeis-Warren Essay, 4 Harvard L. Rev. 193, p. 214; *Brents* v. *Morgan*, 221 Ky. 765 [299 S. W. 967, 55 A. L. R. 964].) In connection with what constitutes news regarding matters of public or general concern, it is said in *Associated Press* v. *International News Service*, 245 Fed. 248 [2 A. L. R. 317, C. C. A. 2] (aff. 248 U. S. 215 [39 Sup. Ct. 68, 63 L. Ed. 211, 2 A. L. R. 293]), that news is said to have ''that indefinable quality of interest which attracts public attention''; while the court in *Jenkins* v. *News Syndicate Co.*, 128 Misc. 284, 285 [219 N. Y. Supp. 196, 198], defines news as a ''report of recent occurrences''.

It seems to us that by her own conduct Mrs. Metter waived any existing right of privacy, ''relational'' or otherwise, that would prevent the publication of her picture in connection with the newspaper story. She went to a public edifice in the heart of a large city and there ended her life by plunging from such high building. It would be difficult to imagine a more public method of self-destruction. For a brief period and in the pitiful and tragic circumstances attending her demise she became an object of public interest. Her own act brought this about. It was her own act which waived any right to keep her picture from public observation in connection with the news account of her suicide.

■ Referring again to the publication of the photograph of Mrs. Metter, it is urged by appellant that he possessed a property right enabling him to control the copying by defendants of the photograph of his deceased wife. Appellant's contention in this regard is thus stated by him in his brief: ''Certainly if I give a photograph to a friend, I do not thereby give such friend a right to deliver that photograph to a paper to be published, since, like a letter, the general property rights still remain in me, while the friend has only the

special property right of using it in the ordinary manner that photographs are used. In other words, the analogy is complete between the photograph and the written letter.''

Thus appellant seeks to apply to the case at bar the law relating to the use of private letters, contending that he has the same *property right* to control copying and publication of his wife's picture as the author of a private letter has to control the copying and publication of such letter. This contention involves the application of common-law rules with respect to literary property, sometimes referred to as the law of common-law copyright. The ownership of a common-law copyright in a photograph, the publication of which is sought to be enjoined or damages sought for the publication of copies thereof, is a matter of proof, and the burden rests upon the plaintiff to show that he was the owner of the copyright. Such right may be in the photographer who took the picture, in the one whose picture was taken, or even a third party who procured the photographed person to pose for the picture and who paid for the same. (*Press Pub. Co.* v. *Falk,* 59 Fed. 324; *Lumiere* v. *Robertson-Cole Distributing Corp.,* 280 Fed. 550 [24 A. L. R. 1317] ; *Altman* v. *New Haven Union Co.,* 254 Fed. 113; *Douglas* v. *Stokes,* 149 Ky. 506 [149 S. W. 849, Ann. Cas. 1914B, 374, 42 L. R. A. (N. S.) 386].) This property right may also be assigned by the possessor thereof. Therefore, possession of a print made from the negative raises no presumption that the possessor is the owner of the common-law copyright in and to the picture. All that the record before us shows is that the appellant had in his possession a photograph of his wife, i. e., one of a number of prints which had been made from a negative prepared by a photographer who originally posed Mrs. Metter. Nothing is shown with reference to the circumstances surrounding the taking of the photograph to indicate who possessed the common-law copyright therein. Nor is there any evidence to show that such property right was vested in appellant. True, he had a print made from the negative, but there is no evidence that he possessed the exclusive right to regulate reproduction of prints made from the original negative.

■ During the trial the court by its ruling excluded evidence of a telephone conversation between plaintiff and defendant night city editor Morgan, on the ground that suffi-

cient foundation was not laid to establish the identity of Morgan as one of the participants in the conversation. No prejudicial error can be predicated upon this ruling, for the reason that what plaintiff sought to establish by the proffered testimony was that in the conversation he advised defendants that the photograph of his wife had been stolen from his home and that he claimed the same was in possession of defendant Examiner; and there is in the record evidence that plaintiff made these identical claims to defendant Morgan in a subsequent conversation a few hours after the telephone conversation, which later conversation took place several hours prior to the time the edition of the newspaper containing the picture of plaintiff's wife went to press.

■ We perceive no prejudicial error in the trial court's ruling sustaining an objection interposed by defendants to questions asked of plaintiff as to whether the reproduced and published picture of his wife was a fair and accurate reproduction of the photograph of his wife which was taken from his apartment. Plaintiff was permitted to testify that the picture in the newspaper appeared and looked similar to the photograph which was in plaintiff's apartment and that the two pictures, the photograph which had been removed from his home and the picture which was printed in the newspaper, had the same characteristics. Furthermore, we fail to see how the testimony in the form it was sought to be elicited by plaintiff, would be material to the issues raised by the pleadings or framed by the evidence.

■ Nor was there prejudicial error in the ruling of the trial court by which the witness Van Ettisch, managing editor of defendant newspaper, was not permitted to testify in relation to the routine, right and practice of the editors of defendant newspaper to delete, alter or modify articles prepared for publication, because plaintiff had the benefit of defendant Morgan's testimony that in his capacity as night city editor Morgan had in the past modified and changed articles which had been prepared for publication and that there were cases when changes had been made in stories after the "lay-out" for a particular edition had been drafted, thereby establishing the fact that it was within the power of those in charge of the editorial department of the newspaper as defendant Morgan was to make such alterations. Moreover, the evidence clearly indicates that the first edition in which the

photograph of appellant's wife appeared did not go to press until several hours after he had a conversation with night city editor Morgan in which appellant forbade publication of his wife's picture. Further, the determination of the issues in this case is not affected by the existence or absence of such authority in the newspaper editors.

By reason of the foregoing, we find it unnecessary to determine the correctness of the court's ruling sustaining a demurrer without leave to amend to plaintiff's fourth cause of action, having to do with the right of privacy. A claim under such right was presented in the first cause of action of his amended complaint.

■ The attempted appeal from the order granting the motion for a directed verdict is dismissed, for the reason that no appeal lies from such order.

From what we have herein said it follows that the trial court was correct in directing the jury to return a verdict in favor of defendants, and the judgment entered upon such verdict must be and it is therefore affirmed.

York, P. J., concurred.

DORAN, J., Dissenting.—I dissent, although I am in entire accord with much of that which is enunciated in the prevailing opinion. That "there is a presumption that a person is innocent of crime or wrong, the benefit of which can only be destroyed by evidence", as declared in the prevailing opinion, there can be no question. It must be emphasized, however, that this presumption is merely a disputable presumption. In my judgment, the evidence adduced by the plaintiff with regard to the loss by him of the photograph and the possession of a copy of such photograph by the defendant newspaper, was sufficient to overcome the presumption and shift the burden of proof to the defendant. In that connection, the obvious interest of the defendant newspaper in obtaining a photograph was a circumstance of no little consequence.

In the light of the record, and the burden of proof having shifted, the defendant was bound to explain the lawful possession of the photograph as well as the justification for its publication. Such questions of fact were properly for the

jury's determination. Upon this premise in my opinion, the order granting the motion for an instructed verdict was error.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 28, 1939. Carter, J., voted for a hearing.