345 F.2d 418
 18 A.L.R.3d 863
 Mafalda MARITOTE, Administratrix of the Estate of Alphonse
(Al) Capone, Deceased, Mae Capone and Albert
Capone, Plaintiffs-Appellants,
v.
DESILU PRODUCTIONS, INC., a California corporation, Columbia
BroadcastingSystem, Inc., a New York corporation,
and Westinghouse Electric Corporation,
aPennsylvania corporation,
Defendants-Appellees.
 No. 14828.
 United States Court of Appeals Seventh Circuit.
 April 30, 1965.
 
 Harold R. Gordon, Chicago, Ill., for appellants.
 Newell S. Boardman, Chicago, Ill., Lord, Bissell & Brook, Chicago, Ill., of counsel, for appellees.
 Before DUFFY, SCHNACKENBERG and KNOCH, Circuit Judges.
 SCHNACKENBERG, Circuit Judge.
 
 
 1
 This action is maintained by Mafalda Maritote, Administratrix of the estate of Alphonse (Al) Capone, deceased, Mae Capone, his widow, and Albert Capone, his son, plaintiffs, against Desilu Productions, Inc., a California corporation, Columbia Broadcasting System, Inc., a New York corporation, and Westinghouse Electric Corporation, a Pennsylvania corporation, defendants.
 
 
 2
 Maritote claimed a property right to recover for unjust enrichment arising out of an alleged appropriation by defendants of the 'name, likeness and personality' of Al Capone. Mae Capone and Albert Capone asserted a claim for invasion of their privacy, arising out of the identical acts of defendants. There was also a prayer for an injunction.
 
 
 3
 Sustaining defendants' contention that no cause of action was stated, the district court dismissed plaintiffs' third amended and supplemental complaint and plaintiffs' case. Plaintiffs have appealed.
 
 
 4
 This is a diversity action and the law of Illinois applies.
 
 
 5
 Most prominently emphasized by plaintiffs in argument is the assertion by the widow and the son of Al Capone, deceased, of an invasion of their right of privacy by defendants, resulting from the latter's 'commercial exploitation' of decedent in commercially televised fictional broadcasts after his death. Plaintiffs do not claim that they were referred to or shown in any of said broadcasts.
 
 
 6
 From these controlling facts we turn to the Illinois law. In Bradley v. Cowles Magazines, Inc., 26 Ill.App.2d 331, at 333, 168 N.E.2d 64, at 65 (1960), the court said:
 
 
 7
 'The legal question before us is, shall the right of privacy be extended to provide damages for the anguish of a mother, caused by a publication concerning the murder of her son, although she herself was not featured or substantially publicized. The articles purport to give an account of the murder as related to a reporter by the two men who were accused and were acquitted. * * *'
 
 
 8
 The court held that the right of privacy of plaintiff should not be extended to cover the asserted claim, although in that case plaintiff was referred to at least once in the alleged offensive publication.
 
 
 9
 In Bradley, Justice Schwartz, at 336, 168 N.E.2d at 66, relied on Metter v. Los Angeles Examiner, 35 Cal.App.2d 304, 95 P.2d 491 (1939), saying:
 
 
 10
 '* * * The court also held that a right of action for the invasion of the right of privacy was purely personal, and that the plaintiff must prove invasion of his own right of privacy before he can recover. * * *'
 
 
 11
 To the same effect is Insull v. New York World-Tel. Corp., D.C., 172 F.Supp. 615, affirmed, 7 Cir., 273 F.2d 166 (1959), cert. den. 362 U.S. 942, 80 S.Ct. 807, 4 L.Ed.2d 770.
 
 
 12
 The same reasoning appears in Kelly v. Johnson Publishing Co.,160 Cal. App.2d 718, 325 P.2d 659 (1958), where the surviving sisters of a deceased boxer sued for invasion of their right of privacy by an article published by defendant. The article referred to the deceased brother as 'a dope-sodden derelict'. The court, at 662 of 325 P.2d, stated,
 
 
 13
 'The authorities appear to be uniform that the right of privacy cannot be asserted by anyone other than him whose privacy is invaded. The publication did not invade plaintiffs' privacy in any respect. * * *'
 
 
 14
 We hold that these authorities justified the action of the district court and, in so holding, we reject as irrelevant the contention that plaintiff Albert Capone, son of Al Capone, claimed special damages.
 
 
 15
 In counts I, II, III and IV, the administratrix of Capone's estate relies on an alleged appropriation of decedent's name, likeness and personality in the telecasting of events in his life. Recovery is sought for unjust enrichment of defendants at expense of plaintiff.
 
 
 16
 Plaintiffs have been misled by their own quotation of the court's language in Eick v. Perk Dog Food Co., 347 Ill.App. 293, 299-300, 106 N.E.2d 742, 745, including the following:
 
 
 17
 '* * * Relying on property rights, courts have * * * given damages for mental suffering caused by tampering with corpses of deceased relatives, * * *.'
 
 
 18
 However, the Illinois court was there considering the nature of damages recoverable by those having property rights in the bodies of deceased relatives. It was not then discussing whether such right did exist.
 
 
 19
 Undoubtedly the next of kin have a right of burial of the body of a deceased person and for an invasion of that right courts will grant relief. But that right is not involved or claimed by plaintiffs here; they rely on the law pertaining to their claimed right of privacy.
 
 
 20
 Accordingly, we hold that what plaintiffs call the 'dead body cases'[1] do not apply in the case at bar.
 
 
 21
 While on July 6, 1962, by an amendment to the complaint, the widow and son were added as new parties, we agree with the district court that all of the relief sought by the several plaintiffs is essentially for a claimed invasion of a right of privacy.[2]
 
 
 22
 Al Capone died in January, 1947. The telecasts here involved were made on April 20 and 27 and October 15 and 23, 1959 and thereafter. We here deal with claimed invasions of privacy occurring over 12 1/2 years after Capone died. It is anomalous to speak of the privacy of a deceased person. The telecasts did not mention any plaintiff here and hence the privacy of no plaintiff was invaded by defendants. As Shakespeare said, 'The evil that men do lives after them * * *.' What a man does while alive becomes a part of history which survives his death. Comment, fictionalization and even distortion of a dead man's career do not invade the privacy of his offspring, relatives or friends, if they are not even mentioned therein. If the law is to be otherwise, it should be attained by legislative enactments, as, according to plaintiffs' brief, has been done in Virginia, Utah and Oklahoma. This court has and makes no pretense to having any lawmaking power. We are fully occupied in interpreting the law and applying it.
 
 
 23
 After the filing in this court of the record on appeal, plaintiffs filed two motions asking us to take judicial notice of what they described as television showings of motion pictures of the subject matter of the initial complaint herein. There appearing to be no basis for thus extending the record on appeal, we reject said motions.
 
 
 24
 All arguments made by plaintiffs have been considered, even though not expressly mentioned herein. We find no error committed below.
 
 
 25
 For these reasons, the order of the district court from which this appeal was taken is affirmed.
 
 
 26
 Order affirmed.
 
 
 27
 DUFFY, Circuit Judge (concurring in the result).
 
 
 28
 The majority opinion quotes from Shakespeare 'The evil that men do lives after them.' Defendants' brief is replete with epithets referring to Al Capone as 'most ruthless killer of the century,' 'killed every competitor,' 'name, likeness and personality stand for nothing but crime,' and 'most notorious gangster in the era in which he lived.'
 
 
 29
 I hold no brief for Al Capone. However, there is nothing in this record to indicate that his widow and son have been other than peaceful, law-abiding citizens. They claim they have been wronged by the defendants and, in the instant suit, they are seeking redress.
 
 
 30
 Until the spring of 1959, when the course of conduct of certain defendants commenced, Mae Capone, widow of Al Capone, and his son, Albert, usually called 'Sonny', were leading a peaceful life in comparative obscurity. Sonny was operating a restaurant in a Florida city.
 
 
 31
 As a direct consequence of the commercial exploitation of the name and likeness of the deceased husband and father, in a series of television dramas which were broadcast over nation-wide networks for six consecutive years, the peaceful lives of the widow and son were shattered.
 
 
 32
 Soon after these 'Capone' shows were broadcast, Sonny's children at school were rediculed by their classmates to the extent that they often returned to their home in tears. The situation, as the broadcasts continued week after week, became so distressing that Sonny felt it necessary to remove his children from school, sell his home and restaurant business, change his name and move to another city.
 
 
 33
 In 1959, Desilu Productions, Inc. (Desilu) sold to Columbia Broadcasting System a two-part drama called 'The Untouchables.' This was a dramatization of certain wholly fictional events supposed to have happened during the lifetime of Capone. The scenes and incidents pertaining to Capone were pure invention and were the product of the imagination of the script writers. The commercial exploitation of the name 'Capone' succeeded so well that Desilu produced for broadcast on the American Broadcasting Company a weekly series also entitled 'The Untouchables.' This weekly broadcast continued for the period of five years. Throughout the series, the name 'Capone' was used and, at times, his purported likeness.
 
 
 34
 Desi Arnaz was president of Desilu. He had been a boyhood friend of Sonny who pleaded with him to refrain from proceeding with the production of 'The Untouchables.' Arnaz refused to discuss the matter with Sonny. Apparently the profit motive outweighed any concern about injury to innocent people.
 
 
 35
 Another full-scale exploitation of the name, likeness and personality of Al Capone was created by Desilu in an episode called 'The Big Train.' This purportedly portrayed a plot by Capone to escape while being transferred from Atlanta prison to Alcatraz. This whole incident was completely fictitious. Nothing like it as far as Al Capone was concerned, ever occurred. In fact, a public protest of this broadcast was made to the Federal Communications Commission by James V. Bennett, Director of the Federal Bureau of Prisons.
 
 
 36
 Plaintiffs argue that the magnitude of the commercial exploitation of the name, likeness and personality of Capone by Desilu makes this a case of first impression. Plaintiffs point out that Desilu depicted more than one hundred fictitious murders, machine gunnings, beatings and other crimes of violence which were falsely attributed to Al Capone, and that for approximately six years, the widow and son were mentally tortured week after week.
 
 
 37
 The defendants have been profiting, not from Al Capone's life of crime, but from the commercial exploitation of publicity values inherent in his name, likeness and personality as portrayed in the telecasting of a series of wholly fictional crimes.
 
 
 38
 I think the right of privacy of Mae Capone and Sonny Capone was invaded by Desilu and other defendants whose conduct as hereinbefore described is, in my mind, reprehensible. Their fictitious products overstepped the bounds of decency. But the question is-- do the widow and son have a claim for invasion of privacy under Illinois law?
 
 
 39
 Several of the cases relied on by defendants and, to some extent, in the majority opinion, deal with a specific crime or crimes which had been committed and which were a matter of public record. These cases should be distinguished from the situation where wholly fictitious crimes were depicted as exploiting the name of Capone.
 
 
 40
 However, in this diversity case, we must decide whether Illinois courts would hold that a remedy exists under Illinois law for the violation of the privacy of the widow and son of Capone. I conclude they would not. I must, therefore, concur in the result reached by the majority.
 
 
 
 [1]
 Larson v. Chase, 47 Minn. 307, 50 N.W. 238, 14 L.R.A. 85 (1891); Koerber v. Patek, 123 Wis. 453, 102 N.W. 40, 68 L.R.A. 956 (1905); Mensinger v. O'Hara, 189 Ill.App. 48 (1914)
 
 
 [2]
 See summation by Dean William L. Prosser, entitled 'Privacy', 48 Calif.L.Rev. 383 (1960)